UNITED STATES of America, Appellee,

v.

Matthew IANNIELLO, Benjamin Cohen, Paul Gelb, Alfred Ianniello, Carl Moskowitz, Morton Walker, Chester Cohen, Bernard Kurtz, and Sol Goldman, Defendants-Appellants.

Nos. 1407, 1411, 1400, 1401, 1408, 1402, 1403, 1409, 1410, Docket 86–1088, –1089, –1090, –1091, –1092, –1093, –1102, –1109, –1110.

United States Court of Appeals, Second Circuit.

Argued July 14, 1986.

Decided Dec. 4, 1986.

Mark F. Pomerantz, New York City (Fischetti & Pomerantz, Jay Goldberg, New York City, of counsel), for defendant-appellant Matthew Ianniello.

Frederick P. Hafetz, New York City (Goldman & Hafetz, of counsel) for defendant-appellant Benjamin Cohen.

John L. Pollok, New York City (Hoffman, Pollok & Gasthalter, of counsel) for defendant-appellant Paul Gelb.

Mark A. Summers, New York City (Hoffman, Pollok & Gasthalter, of counsel) for defendant-appellant Alfred Ianniello.

Deborah A. Schwartz, New York City (Gustave H. Newman, P.C., of counsel) for defendant-appellant Carl Moskowitz.

Paul A. Goldberger, New York City for defendant-appellant Morton Walker.

Eugene Neal Kaplan, New York City (Kaplan, Thomashower & Landau, of counsel) for defendant-appellant Chester Cohen.

Sol Goldman, pro se.

Judd Berstein, New York City, for defendant-appellant Sol Goldman.

Gerald B. Lefcourt, New York City (Gerald B. Lefcourt, P.C., of counsel) for defendant-appellant Bernard Kurtz.

Howard E. Heiss, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., James B. Rather, Kenneth Roth, Asst. U.S. Attys., New York City, on the brief), for United States.

Before WINTER and MAHONEY, Circuit Judges, and LASKER, District Judge.*

MAHONEY, Circuit Judge:

Defendants appeal from judgments entered upon their convictions by a jury in the Southern District of New York, raising a number of issues. We affirm, and discuss only the questions concerning the construction of the indictment, the definition of a pattern of racketeering activity under the Racketeer Influenced and Corrupt Organizations Act, Pub.L.No. 91–452, tit. IX, 84 Stat. 941 (codified as amended at 18 U.S.C. §§ 1961–1968 (1982 & Supp. III 1985)) ("RICO"), the elements of mail fraud based upon fraud on the New York State Liquor Authority ("SLA") and state tax authorities, the effect of the twenty-first amendment on the federal government's ability to regulate the mails, and the corroboration necessary to convict on a co-conspirator's statement.

The indictment alleged, *inter alia,* a broad conspiracy to violate RICO, substantive violations of RICO, mail fraud, bankruptcy fraud and tax evasion.

At trial, the government established [1] that the defendants were part of a group that skimmed profits from bars and restaurants that they owned and operated in New York City. Matthew Ianniello and Benjamin Cohen [2] directed the enterprise's activities, supervising and overseeing its affairs from offices in Manhattan.[3] While they received the greatest profits from its oper-

ations, the bars and restaurants ostensibly were owned and managed by others, who acted as "fronts" for Ianniello and Cohen.

As part of the scheme to skim money, the defendants obtained liquor licenses from the SLA for the businesses. Ianniello's and Cohen's financial interests in and receipt of money from the bars and restaurants were concealed from the SLA. This eased the granting of the liquor licenses and made the skimming more difficult to detect.

In addition, the scheme included a plan to defraud the New York State Department of Taxation and Finance (the "Department") by understating gross receipts in sales tax returns. Further, the defendants defrauded the legitimate creditors of the Peppermint Lounge, one of the enterprises involved in this operation,[4] by skimming its receipts while the bar was in bankruptcy proceedings. Finally, various of the recipients of the skimmed cash receipts failed to pay personal income taxes on those receipts.

A lawyer and accountant also participated. Carl Moskowitz ("Moskowitz"), the lawyer, prepared false liquor license applications that were submitted to the SLA for the Mardi Gras, the Haymarket, the Grapevine and the Peppermint Lounge.[5] Sol Goldman ("Goldman"), the accountant, helped conceal the skimming and diversion of income from the Peppermint Lounge, the New Peppermint Lounge and Umberto's Clam House through false books and records, and prepared and filed false state

---

* The Honorable Morris E. Lasker, Senior District Court Judge of the United States District Court for the Southern District of New York, sitting by designation.

1. The government's case was built primarily on electronic audio and video surveillance at the offices of Matthew Ianniello and Benjamin Cohen at C & I Trading, which were at 135 West 50th Street in Manhattan. The operations of the group were directed from C & I Trading. The surveillance was conducted from September 7, 1982 to December 27, 1982.

2. References to "Ianniello" and "Cohen" are to Matthew Ianniello and Benjamin Cohen respectively.

3. See *supra* note 1.

4. The Peppermint Lounge was also known at various times as the "Hollywood" and "G.G. Barnum's." The other establishments involved were the "Mardi Gras," the "Haymarket," the "Grapevine," "Umberto's Clam House" and the "New Peppermint Lounge," also known as the "Electric Circus" prior to its acquisition by certain of the defendants herein, all at various locations in Manhattan, New York City.

5. Moskowitz maintained an office at C & I Trading, for which he paid no rent.

tax returns for the same enterprises. Goldman also assisted in the bankruptcy fraud committed during the bankruptcy proceedings of the Peppermint Lounge.

The most profitable business was P & G Funding Corp., which operated the Mardi Gras. The bar opened in January, 1979, and for the first two years of its operation the owners of record were Paul Gelb and his wife, Pauline Gelb.[6] Subsequently, Pauline Gelb became the sole owner of record. From the time the Mardi Gras opened its doors in 1979, Ianniello, Cohen and Gelb regularly skimmed its cash receipts, dividing the money equally among themselves. By the end of 1982, the defendants had divided over $2 million in unreported income.

The original liquor license application prepared by Moskowitz and filed by the Mardi Gras with the SLA in October 1978 stated that no one other than Paul and Pauline Gelb had a financial interest in the Mardi Gras or would share in the receipts of the bar, hiding Ianniello's and Cohen's stake in the Mardi Gras. This was repeated in the later liquor license renewal applications. These defendants also concealed their skimming at the Mardi Gras from the Department by understating the bar's true gross receipts.

The record owner of Osbro Restaurant, Inc., which did business as "Umberto's Clam House," was Robert Ianniello,[7] and the restaurant was managed by Oscar Ianello.[8] Their two brothers, Matthew Ianniello and Alfred Ianniello, however, controlled the business and skimmed its receipts. Liquor license renewal applications filed with the SLA did not disclose Matthew Ianniello's interest in Umberto's Clam House. The books and records of the restaurant, kept by Goldman, concealed the skimming by showing false receipts and expenses. The sales tax return for the period September through November 1982 also understated the true receipts of the restaurant, as well as the amount of sales tax due.

The "Peppermint Lounge," Mar-Jear Restaurant, Inc., was a bar and nightclub located in Manhattan. While ostensibly owned by Herbert Taylor ("Taylor"), the bar was controlled by Ianniello and Cohen, who skimmed cash from the receipts of the bar. Bernard Kurtz ("Kurtz") was the manager. Kurtz made the major management decisions, particularly regarding money and expenses. In the fall of 1980, Kurtz hired Frank Rocchio ("Rocchio"), his niece's husband, to book bands for the bar. The bar paid for the bands hired by Rocchio.

By the spring of 1982, the Peppermint Lounge had been closed down a number of times by the New York City Fire Department because of overcrowding. As a result, the Peppermint Lounge moved into the physical facilities of a larger bar and nightclub, which at the time was called the "Electric Circus," whose corporate identity was Circus Disco, Ltd. The name of the "Electric Circus" was changed to the "New Peppermint Lounge."

The facilities of the new nightclub, which operated under a similar format and with essentially the same personnel as the old Peppermint Lounge, were purchased from George Vallario, Jr., Nicholas Orlando and their partners by Kurtz, on behalf of Ianniello and Cohen. The sale was concealed from the SLA, and the New Peppermint Lounge opened for business on May 26, 1982. In the fall of 1982, Kurtz stopped making the weekly payments due to the Vallario group on the purchase of the bar. Shortly thereafter, the Vallario group repossessed the bar from Kurtz.

The defendants skimmed the admission charges at both the Peppermint Lounge and the New Peppermint Lounge. For example, in February 1982, Goldman wrote a letter to the Department "concerning the

---

6. Pauline Gelb was indicted and tried. Judge Weinfeld entered a judgment of acquittal for her at the close of the government's case. References to "Gelb" are to Paul Gelb.

7. Robert Ianniello was granted an order of acquittal at the close of the government's case.

8. Oscar Ianello was acquitted by the jury at trial on all counts.

taxable status of admission charges to a disco and bar." The Department's Sales Tax Instructions and Interpretations Unit responded that the sales tax applied to such charges. Shortly after this, the defendants formed Rock-eo Entertainment, Ltd., named after Rocchio, to divert admission receipts from the New Peppermint Lounge. In a contract between Rock-eo Entertainment and Circus Disco, Rock-eo Entertainment agreed to provide the music as an independent contractor for Circus Disco. Under the terms of the agreement, Rock-eo Entertainment had complete control over the promotion of music at the New Peppermint Lounge and was obligated to pay all expenses in that regard. The expenses were to be paid from the door receipts, which Rock-eo Entertainment was obligated to collect. The excess door receipts were to be Rock-eo Entertainment's profit. In reality, however, Rock-eo Entertainment was wholly controlled by the defendants; admission charges collected at the New Peppermint Lounge went to the defendants, not to Rock-eo Entertainment.

The defendants had also skimmed the admission receipts at the old Peppermint Lounge by failing to report any income from performances by bands. When audited, defendants argued that the receipts were for concerts, and thus were not subject to sales tax.

At the same time the defendants were skimming money from the Peppermint Lounge, the bar was in Chapter 11 bankruptcy proceedings. The Bankruptcy Court, at the request of the record owner Taylor, authorized the Peppermint Lounge to retain Goldman as its accountant in connection with the bankruptcy proceedings. One of Goldman's responsibilities was to prepare the monthly financial statements or operating reports to be filed with the Bankruptcy Court. Those reports, like the bar's books and records, understated the bar's receipts, concealing the skimming by the defendants.

While the bar was in liquidation proceedings, Cohen and Kurtz also took a worker's compensation insurance refund check payable to the Peppermint Lounge and used it to pay an insurance premium owed by the New Peppermint Lounge.

Ianniello and Cohen also controlled the "Haymarket" and the "Grapevine," once again through Kurtz. Cohen's son, Chester Cohen, held the license for the "Haymarket," while Morton Walker held the license at the "Grapevine." As with the other businesses in which Ianniello and Cohen maintained hidden interests, the purpose of their control of these two bars was to skim their receipts, avoid the payment of sales tax thereon by the corporate owners of the bars, and avoid the payment of personal income tax on the skimmed receipts by the recipients thereof.

Ianniello and Gelb were the only defendants to present witnesses, though Ianniello and other defendants presented various documentary evidence as well. Ianniello called Internal Revenue Service Special Agent John Ryan, who had testified on behalf of the government. Through Agent Ryan, Ianniello introduced a number of checks paid by C & I Trading to Ianniello during 1982. The checks, which totaled $17,500, were each for $500, and many of them had been cashed. Those falling within the period of the electronic surveillance numbered eight and totaled $4,000.

Gelb called Thomas O'Toole, who testified that in his opinion Gelb had an excellent general reputation, though O'Toole knew nothing about the facts of the case.

All appellants were convicted of conspiracy to violate RICO, and a substantive violation of RICO. Ianniello was also convicted of thirty-five counts of mail fraud and six counts of tax evasion. Cohen was convicted of thirty-five counts of mail fraud, twelve counts of bankruptcy fraud and six counts of tax evasion. Gelb was convicted of nineteen counts of mail fraud and six counts of tax evasion. Kurtz was convicted of sixteen counts of mail fraud and twelve counts of bankruptcy fraud. Walker and Chester Cohen were convicted of two counts of mail fraud. Moskowitz was convicted of eleven counts of mail fraud. Goldman was convicted of eight counts of

mail fraud and twelve counts of bankruptcy fraud. Alfred Ianniello was convicted of three counts of mail fraud.

### The Indictment

The defendants contend that the prosecution and the court below constructively amended the mail fraud counts of the indictment. The indictment charged mail fraud on both the SLA and the Department. The goals of those frauds are in dispute.

The indictment's first two counts alleged a conspiracy to violate and substantive violation of RICO. In those counts, the broad goals and purposes of the enterprise were stated to be to obtain liquor licenses through false information, skim profits, evade taxes and defraud the creditors of a bankrupt company. Indictment ¶¶ 2–9. The indictment then set out the mail fraud and bankruptcy fraud counts, which also served as the RICO predicate acts. Some of the mail fraud counts fail to allege the exact pecuniary goal of the fraud—stating generally that it was part of a scheme to defraud.

The government and the court below interpret the indictment to charge a broad scheme to skim profits and evade taxes on the restaurants and bars. *See United States v. Ianniello*, 621 F.Supp. 1455, 1474 (S.D.N.Y.1985). Defendants argue, however, that the counts alleging mail fraud on the SLA charge only that they caused false applications and renewal applications for liquor licenses to be submitted to the SLA. Accordingly, they contend, no intent to reap pecuniary benefit or loss was charged by the indictment, requiring dismissal of those counts. *See United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180–81 (2d Cir.1970).[9] Grafting the broad allegations from the RICO counts onto the individual mail fraud counts, they further argue, would violate the rule that "[e]ach count in an indictment is regarded as if it was a separate indictment." *United States v. Fulcher*, 626 F.2d 985, 988 (D.C. Cir.), *cert. denied*, 449 U.S. 839, 101 S.Ct. 116, 66 L.Ed.2d 46 (1980).

▋ Each count does allege, however, that the defendants participated in a scheme to defraud. The argument that it is impermissible at trial to alter the goal of the scheme as stated in the indictment is foreclosed by *United States v. Weiss*, 752 F.2d 777 (2d Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985). In that case, the goal charged was personal enrichment; the goal upon which the defendant was tried and convicted was the creation of a corporate "slush" fund. *See Weiss*, 752 F.2d at 786; *id.* at 791 (Newman, J., dissenting). *A fortiori*, if the goal can be completely changed by proof at trial, it can be made more specific at trial. Moreover, the defendants in this case had ample notice of the core of the charges against them, *see United States v. Heimann*, 705 F.2d 662, 666 (2d Cir.1983); *United States v. Sindona*, 636 F.2d 792, 797–98 (2d Cir.1980), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981), because the theory of the prosecution was stated in the RICO conspiracy counts, and in deciding pretrial motions Judge Weinfeld made the exact nature of the charges clear to the defense. *See United States v. Ianniello*, 621 F.Supp. 1455, 1473–75 (S.D.N.Y. 1985). Even if this were not the case, however, assertions of prejudice from variance would be unavailing, since the defense of the RICO allegations necessarily defended against the SLA mail fraud counts which were listed as RICO predicate acts. *See Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630–31, 79 L.Ed. 1314 (1935); *Sindona*, 636 F.2d at 798–99.

### Pattern Requirement of RICO

Appellants contend that *United States v. Weisman*, 624 F.2d 1118 (2d Cir.), *cert.*

---

9. The government does not argue that the convictions with respect to the SLA counts are sustainable on any theory of fiduciary obligation. *See United States v. Weiss*, 752 F.2d 777, 783–84 (2d Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985); *United States v. Margiotta*, 688 F.2d 108, 121 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).

*denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980), which held that two predicate acts can suffice to satisfy the pattern requirement of RICO,[10] should be reconsidered in light of the Supreme Court's dictum in a footnote in *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, ——— n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985).[11] Citing legislative history, that footnote indicates that a combination of relationship and continuity between separate acts is required to establish a pattern. Two acts are to be considered as necessary but not sufficient to constitute a pattern. *Id.;* 18 U.S.C. § 1961(5) (1982).

█ This court is bound by a decision of a prior panel unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court or this court *en banc. See In re Jaylaw Drug, Inc.,* 621 F.2d 524, 527 (2d Cir.1980); *Boothe v. Hammock,* 605 F.2d 661, 663–64 (2d Cir.1979). Because

the *Sedima* footnote does not rise to the level of a holding, it is not controlling. It would be particularly inappropriate in this case, however, to reconsider *Weisman,* since that case carefully and thoughtfully addressed the concerns later considered by the Supreme Court in the *Sedima* footnote. *See Weisman,* 624 F.2d at 1121–23. There is no indication in that footnote that the Supreme Court had considered and rejected the *Weisman* analysis.

Under *Weisman,* relatedness is supplied by the concept of "enterprise" expressed in section 1962(c) [12] and the ten year requirement of section 1961(5). The link between the acts is supplied by the fact that "the predicate acts constituting a 'pattern of racketeering activity' must all be done in the conduct of the affairs of an 'enterprise.'" *Id.* at 1122. This also supplies the necessary element of continuity, since an enterprise is a continuing operation.

---

**10.** Each substantive RICO subsection, 18 U.S.C. § 1962(a)–(c) (1982), requires a pattern or collection of an unlawful debt (which is not applicable to this case). A pattern of racketeering activity, as defined in the statute, "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." · 18 U.S.C. § 1961(5) (1982).

**11.** The footnote states:

As many commentators have pointed out, the definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern *"requires* at least two acts of racketeering activity," § 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added). Similarly, the sponsor of the Senate bill, after

quoting this portion of the Report, pointed out to his colleagues that "[t]he term 'pattern' itself requires the showing of a relationship.... So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern...." 116 Cong.Rec. 18940 (1970) (statement of Sen. McClellan). See also *id.* at 35193 (statement of Rep. Poff) (RICO "not aimed at the isolated offender"); House Hearings, at 665. Significantly, in defining "pattern" in a later provision of the same bill, Congress was more enlightening: "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3575(e). This language may be useful in interpreting other sections of the Act. Cf. *Iannelli v. United States,* 420 U.S. 770, 789, 95 S.Ct. 1284, 1295, 43 L.Ed.2d 616 (1975).

105 S.Ct. at 3285 n. 14.

**12.** Section 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate, or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c) (1982). The term "enterprise" also appears in subsections (a) and (b) of section 1962.

*See United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981); *see also Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 21–22 (2d Cir.1983) (section 1962(c) requires relation between enterprise and pattern), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). Thus, it would appear that the difference between *Weisman* and *Sedima* is one of form and not of substance.[13]

■ In fact, support for this view of the case is found in Judge Weinfeld's charge, which met the dictates of *Weisman* and the suggestion of *Sedima*. The jury was instructed at several points that the acts must be related to the enterprise and to a continuous activity. Transcript 3036, 3037–44, 3058, 3061. Thus, any failure to charge in precisely the language contemplated by *Sedima* would be at most harmless error.

### Discrete Versus Continuous Criminal Activity

It is also claimed that Chester Cohen was improperly convicted under section 1962(c) of two predicate acts which did not constitute a pattern of racketeering activity within the meaning of the statute. Chester Cohen was convicted on mail fraud predicate acts which, in turn, were based on deceptive license renewal applications in successive years to the SLA for the same establishment.[14] This, he argues, is a single, discrete crime which cannot, as a matter of law, constitute a pattern.

A distinction has been drawn in some cases between crimes aimed at a discrete goal, singular in time and in instance, and crimes committed to further continuing criminal activity. *Compare Professional Assets Management, Inc. v. Penn Square Bank*, 616 F.Supp. 1418, 1420–22 (W.D. Okla.1985) (fraudulent preparation of an audit report is a single instance and there-

fore crimes to further that goal are not a pattern) *with Rush v. Oppenheimer & Co.*, 628 F.Supp. 1188, 1198–1200 (S.D.N.Y.1985) (multiple instances of churning of a single account, together with related misrepresentations and deceptions, constitute a pattern).

■ This distinction is derived from the *Sedima* Court's suggestion of relatedness and continuity. *See Soper v. Simmons International, Ltd.*, 632 F.Supp. 244, 250–54 (S.D.N.Y.1986) (discussing evolution of case law dealing with this question since *Sedima*). As discussed above, we believe that the inquiry as to relatedness and continuity is best addressed in the context of the concept of "enterprise" expressed in section 1962(c), and to a lesser extent, the ten year requirement of section 1961(5). An enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct" and "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). This circuit requires that, under section 1962(c), the enterprise be a continuing operation and that the acts be related to the common purpose. *See Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 21–22 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *United States v. Mazzei*, 700 F.2d 85, 89 (2d Cir.), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983). This result derives from the language of section 1962(c), which requires that the pattern of predicate acts be done in the conduct of the affairs of the enterprise. *See Weisman*, 624 F.2d at 1122. Thus, an enterprise with "a single purpose," here fraud continuing indefinitely, can provide the basis for a section 1962(c) violation. The common pur-

---

**13.** Other circuits have also treated the *Sedima* dictum as not marking a sharp departure in the law. *See, e.g., Bank of America National Trust & Savings Association v. Touche Ross & Co.*, 782 F.2d 966, 970–71 (11th Cir.1986); *R.A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350, 1355 (5th Cir.1985). *But see Superior Oil Co. v. Fulmer*, 785 F.2d 252, 254–58 (8th Cir.1986).

**14.** Walker and Alfred Ianniello were convicted on similar facts, and adopted Chester Cohen's argument on this point.

pose in this case was to skim profits and had no obvious terminating goal or date, clearly establishing the enterprise requirement.

The Eighth Circuit has adopted a contrary view in *Superior Oil Co. v. Fulmer*, 785 F.2d 252 (8th Cir.1986), holding that "one continuing scheme to convert gas from [a] pipeline" did not provide the " 'continuity' sufficient to form a 'pattern of racketeering activity.' " *Id.* at 257. That circuit now requires as part of the definition of pattern proof that the defendants engaged in more than one scheme. *Id. But see Alexander Grant and Co. v. Tiffany Industries, Inc.*, 770 F.2d 717, 718 & n. 1 (8th Cir.1985) (post-*Sedima* decision, upholding as a pattern a series of predicate acts with the goal of obtaining a favorable audit), *cert. denied,* —— U.S. ——, 106 S.Ct. 799, 88 L.Ed.2d 776 (1986). We conclude that forcing such a result from the word "pattern" is a strained and inappropriate reading of the statutory language.[15] Furthermore, it would appear that a requirement of multiple schemes would undercut section 1962(b), which states:

> It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or

indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(b) (1982). This provision does not prohibit an enterprise which is committing predicate acts; rather it prohibits predicate acts which are aimed at taking over an enterprise. *See United States v. Cauble*, 706 F.2d 1322, 1331 n. 11 (5th Cir.1983), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). It prohibits one scheme to acquire an interest in an interstate enterprise. To require two schemes as part of the *definition* of pattern under section 1961(5) would effectively eliminate this provision.[16]

■ We decline to embrace this incongruous result. Instead, we hold that when a person commits at least two acts that have the common purpose of furthering a continuing criminal enterprise with which that person is associated, the elements of relatedness and continuity which the *Sedima* footnote construes section 1962(c) to include are satisfied. In this regard, we note that a recent opinion of this court similarly construes *Sedima* footnote fourteen. *See United States v. Teitler*, 802 F.2d 606, 611–12 (2d Cir.1986); *see also*

---

**15.** A variant of the *Superior Oil* approach construes *Sedima* to require multiple "episodes" of criminal activity in order to establish a section 1962(c) pattern. *See, e.g., Frankart Distributors, Inc. v. RMR Advertising, Inc.*, 632 F.Supp. 1198, 1201 (S.D.N.Y.1986) (multiple acts of mail fraud relating to performance of a single contract did not constitute a pattern); *Soper v. Simmons International, Ltd.*, 632 F.Supp. 244, 250–55 (S.D.N.Y.1986) (multiple acts of wire and mail fraud concerning commissions allegedly due with respect to a joint venture did not constitute a pattern). Other recent cases in the Southern District of New York reject the multiple episode requirement, contending that it goes beyond any requirement or legitimate implication of the *Sedima* footnote and provides a vague and unpredictable rule of decision. *See Bankers Trust Co. v. Feldesman*, 648 F.Supp. 17, 25–26 (S.D.N.Y. 1986); *see also Conan Properties, Inc. v. Mattel, Inc.*, 619 F.Supp. 1167, 1170–71 (S.D.N.Y.1985). We agree with the latter view on both counts. As *Sedima* makes clear, 105 S.Ct. at 3287, any further narrowing of RICO, however appropriate

that may be, is a job for Congress, not the courts.

**16.** It should also be noted that the section 1961(5) definition of pattern requires at least two acts of racketeering activity, not two schemes. "Racketeering activity" is in turn defined as various statutory violations in section 1961(1), which has no language requiring a scheme. *See* 18 U.S.C. § 1961(1) (1982). Clearly then, the multiple scheme requirement is not grounded in the statutory language of RICO. Nor are we directed to any clear legislative history to indicate that when, for example, Congress listed mail fraud as an act, it meant only "scheme-like" fraud. To impose such an element, therefore, violates the Supreme Court's admonition against adding requirements not grounded in the statute or the legislative history. *See United States v. Turkette*, 452 U.S. 576, 593, 101 S.Ct. 2524, 2533–34, 69 L.Ed.2d 246 (1981); *see also Sedima, S.P.R.L.*, 105 S.Ct. at 3285, n. 13 (where legislative history was silent, court below should have followed plain language of statute).

*Morgan v. Bank of Waukegan,* 804 F.2d 970 (7th Cir.1986) (collecting cases).

### SLA Mail Fraud

The defendants also argue that the SLA mail fraud convictions must fall because the SLA original application and renewal forms were too ambiguous to support a finding of intent. *See United States v. Gelb,* 700 F.2d 875, 879 (2d Cir.), *cert. denied,* 464 U.S. 853, 104 S.Ct. 167, 78 L.Ed.2d 152 (1983). We disagree. Defendants base their contention on what they term the "confused" testimony of a prosecution expert on the requirements of the forms. However clever defense counsel's cross-examination of the prosecution's witness was, it cannot, and indeed did not, overcome the clarity of those documents themselves.

> The original application asks:

> Has any person not an applicant herein, or, if a corporate applicant, any person not an officer, director or stockholder of such corporation, any interest, financial, proprietary or other, direct or indirect, in the premises or in the business to be licensed, or has made any loan to the applicant for said business or has any lien or mortgage on the fixtures in the business?

> . . . .

> State whether any person not an applicant herein, or if a corporate applicant, any person not an officer, director or stockholder of such corporation, or any person not reported in [the above question], shares or will share on a percentage basis or in any way in the receipts, losses or deficiencies of the business, to any extent whatsoever other than by fixed salary.

■ The renewal form asks for the details of any change in fact since the original application was filed. The licensee then represents by signing that "all statements made in the original application for this license and in any and all applications for renewal thereof are true and correct, except as modified in subsequent renewal applications ˈor as otherwise reported...." This language, in context, requires an update of the original application and further requires the licensee to swear that all information recorded with the SLA reflects the current status of the licensee business.

### Sales Tax Mail Fraud

■ Defendants complain that the court below failed to properly charge the jury on the mail fraud counts relating to sales tax evasion. Judge Weinfeld charged that the defendants could be found guilty if the jury found that the stated gross receipts were false or that the reported amount of sales tax due was understated. It is asserted that this allowed the jury to convict even if no tax was due. Assuming this to be true, it is not error.[17]

**17.** Defendants also claim error with respect to the district judge's charge on the question whether admission receipts at the Peppermint Lounge and the New Peppermint Lounge were subject to sales tax. We disagree. The judge charged the jury that:

> In determining whether or not the sale of beverages was merely incidental to the presentation of live musical performances at the Peppermint Lounge and New Peppermint Lounge, you may take into account: the number and size of bars within the facilities, whether or not beverages were available during periods when live performances were not presented, whether or not admission was charged at times during which there were no live musical performances, whether or not musical performances were emphasized in the advertising done by the Peppermint Lounge

and the New Peppermint Lounge, and the relative proportion of the revenue produced by admission charges and by the sale of beverages.

Defendants contend that the definition of "merely incidental" is derived from the now repealed federal tax on cabarets. *See In re Tralfamadore Cafe, Inc.,* Advisory Op. TSB–A–85(42)S, at 2 (NYSDTF Taxpayer Services Div. Sept. 9, 1985). Defendants argue that the judge should have instructed the jury that, while the other factors should be considered, the primary factor in this determination is the ratio between the admissions revenues and the sales revenues, citing the *Tralfamadore* advisory opinion.

Assuming this to be so, the evidence against defendants on this score was overwhelming, making any error harmless. *See United States v. Terry,* 702 F.2d 299, 313 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304

In *Gelb*, the defendant had defrauded an insurance company by inflating his claimed losses. In the mail fraud prosecution, he argued that the government had failed to prove that his inflated statement of loss resulted in an inflated claim (*i.e.*, he claimed a loss of $684,000 where the insurance coverage was $500,000, and argued that the government had to prove false loss claims in excess of $184,000). The court held that the government need only show a specific intent to defraud. *See Gelb*, 700 F.2d at 879–80; *see also United States v. Rodolitz*, 786 F.2d 77, 80–81 (2d Cir.1986) ("To sustain the [insurance-mail fraud] conviction, the government needed to prove only that Rodolitz employed a· deceptive scheme intended to prevent the insurer from determining for itself a fair value of recovery."). Similarly, in this case the government need only show a specific intent to evade sales taxes. The evidence in the record to support such a finding was ample.

### Twenty-First Amendment

█ The defendants also claim that the twenty-first amendment bars this mail fraud prosecution. However, the federal government's lack of direct power to regulate intrastate liquor does not necessarily imply that it cannot prosecute conduct that also implicates federal concerns. *See Parr v. United States*, 363 U.S. 370, 389, 80 S.Ct. 1171, 1182, 4 L.Ed.2d 1277 (1960) (Congress can forbid conduct through mailing in furtherance of a scheme that it regards as contrary to public policy, whether it can forbid the scheme or not, quoting *Badders v. United States*, 240 U.S. 391, ·

393, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916)); *United States v. DeFiore*, 720 F.2d 757, 761–62 (2d Cir.1983) (same in wire fraud context), *cert. denied*, 466 U.S. 906, 104 S.Ct. 1684, 80 L.Ed.2d 158 (1984) and 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984); *cf. Illinois Department of Revenue v. Phillips*, 771 F.2d 312, 317 (7th Cir.1985) (State of Illinois was a proper plaintiff in a RICO action brought to recover treble damages for evasion of Illinois sales tax). The defense cites cases that hold that federal statutes in which liability is expressly and solely based upon violations of state liquor laws are beyond federal power, *United States v. Constantine*, 296 U.S. 287, 294, 56 S.Ct. 223, 226, 80 L.Ed. 233 (1935); *United States v. Kesterson*, 296 U.S. 299, 300, 56 S.Ct. 229, 80 L.Ed. 241 (1935), and that state regulation of commerce in liquor pursuant to section 2 of the twenty-first amendment may be preempted by federal antitrust laws if the federal policies outweigh the state interests, *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 113–14, 100 S.Ct. 937, 947–48, 63 L.Ed.2d 233 (1980). Those cases do not support the proposition that the federal government cannot prosecute misuse of the mails where that misuse also violates state liquor regulations.

### Corroboration of Co-conspirator's Statements

█ Defendants assert that the evidence of tax evasion by Ianniello, Cohen and Gelb was insufficient because it consisted largely of the uncorroborated statement of Gelb.[18] A conviction cannot be based solely on an uncorroborated extrajudicial con-

---

(1983); *United States v. Finkelstein*, 526 F.2d 517, 522 (2d Cir.1975), *cert. denied*, 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976). Taking the figures most favorably to the defendants (exact amounts are difficult to calculate due to the defendants' conduct), approximately forty-two percent of revenues was derived from liquor sales alone. Where forty percent of revenue was derived from the sale of concessions and refreshments, that in itself was enough to impose the tax. *See Kantor v. United States*, 154 F.Supp. 58, 60–62 (N.D.Tex.1956) (The issue in *Kantor* was whether the analogous federal tax would be imposed upon refreshments as well as

admissions, but the statutory interpretation is nonetheless both relevant and persuasive.). The bars frequently operated without bands, and when bands did play, they performed for short periods of time. At all times, moreover, the bartenders served drinks. The bar also did not always charge for admission, apparently hoping to increase liquor revenues. The Peppermint Lounge had two dance floors and three bars, and is described as a bar in its sales tax returns.

18. PAUL GELB: The whole fuckin' thing is here we cannot go ahead and have another four years here that we think we gonna be like that. You're talking about four years

fession. *See Opper v. United States,* 348 U.S. 84, 89–90, 75 S.Ct. 158, 162–63, 99 L.Ed. 101 (1954). From this proposition, the defense extrapolates the theory that an uncorroborated admission should not be sufficient to convict.

In *Smith v. United States,* 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954), the Court noted that "[a]dmissions given under special circumstances, providing grounds for a strong inference of reliability, may not have to be corroborated. *Cf. Miles v. United States,* [103 U.S. (13 Otto) 304, 26 L.Ed. 481 (1980) ]." *Smith,* 348 U.S. at 155 n. 3, 75 S.Ct. at 198 n. 3. In *Miles,* the defendant was charged with bigamy and the evidence of his first marriage was his own uncorroborated statements. *Miles v. United States,* 103 U.S. (13 Otto) 304, 311–12 (1880). The court affirmed the conviction because there were independent indicia of reliability. *Id.* at 312.

The *Smith* Court held that the rule requiring corroboration applied to admissions when the admission is made to the authorities after the crime and it establishes an essential element of the crime. 348 U.S. at 155, 75 S.Ct. at 198–99. This was based on a concern that admissions may be coerced or otherwise unreliable. *Id.* at 153, 75 S.Ct. at 197–98. Thus, when corroboration is required, its aim is to ensure the reliability of the statement. *Id.* at 156–59, 75 S.Ct. at 199–201; *see also Chambers v. Mississippi,* 410 U.S. 284, 298–301, 93 S.Ct. 1038, 1047–49, 35 L.Ed.2d 297 (1973); *Donnelly v. United States,* 228 U.S. 243, 277–78, 33 S.Ct. 449, 461, 57 L.Ed. 820 (1913) (Holmes, J., dissenting).

■ The proper inquiry, therefore, is whether the statements of Gelb bear independent indicia of reliability. *Cf. United States v. Rodriguez,* 706 F.2d 31, 40 (2d Cir.1983) (in context of Federal Rule of Evidence 804(b)(3)); *United States v. Beltempo,* 675 F.2d 472, 479–80 (2d Cir.) (same), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982). The circumstances of the conversation, a discussion between Gelb and Cohen about their businesses' performances, as well as numerous deliveries of cash before and after the statement, provide that reliability. In any event, the cash deliveries provide the corroboration necessary for conviction even under the defense theory.

### Conclusion

We have examined the remaining defense contentions and find them to be without merit. The judgments of conviction are accordingly affirmed.

---

which, which we can very well say that we, at least we averaged out, at least a half a million dollars a year that we cut up. I would say conservatively, you understand? Which, is uh, which is easy. I would say closer to two and a half but that's alright let's say even closer to two and a half million for four years.
Which, uh, we cannot go ahead and consider ourselves losers here. But you know this operation as long as it's goin who the hell wants to change it for the time being?
BEN COHEN: I know.

PAUL GELB: You understand? How long? I don't know, but eventually we should be thinking ahead of time what we want to do here instead. The custom, this operation is outrageous.
BEN COHEN: I know.
PAUL GELB: And if you do over the fifty thousand, you do over fifty thousand, it pays, you understand? Because you have to, you have to pay (UI). This, that, that but you coming out, you clean. Clean you come out fifteen thousand dollars a week.
A. 745–46.