**LA DELITE, LTD., Plaintiff,**

**v.**

**CHIPWICH, INC., Lamet I, Ltd., VF Consultants, Inc., Samuel Metzger, and Richard LaMotta, Defendants.**

**No. 87 C 1957.**

United States District Court, E.D. New York.

July 10, 1988.

Sheffler Karlinsky & Stein (Martin E. Karlinsky, of counsel), New York City, for plaintiff.

Esanu Katsky Korins & Siger (Mark Walfish, Thomas M. Slahta, and J. Rachael Hamlet, of counsel), New York City, for defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff, La Delite, Ltd., a publicly-held New York corporation making and selling ice cream products, brought this action against defendants, all of whom have New York citizenship, alleging violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68, and the Lanham Act, 15 U.S.C. § 1051 et seq., as well as pendent state law claims. Plaintiff has since withdrawn the Lanham Act claims.

Defendants move to dismiss the RICO claim on two grounds, because it fails to plead fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure, and because it does not state a claim upon which relief may be granted.

The chief question is whether the complaint alleges facts showing that defendants engaged in a "pattern of racketeering activity" within the meaning of RICO. If the court dismisses the RICO claim, the pendent state law claims fall for lack of subject matter jurisdiction.

## THE COMPLAINT

On this motion the court assumes the facts stated in the complaint, which alleges, in substance, the following.

Defendant Samuel Metzger is president and defendant Richard LaMotta is a director of defendant Chipwich, Inc. (Chipwich), a corporation in the business of licensing its name and processes for the sale of novelty ice cream products. Both Metzger and LaMotta are officers of defendants VF Consultants, Inc. (VF Consultants) and Lamet I, Ltd. (Lamet), two consulting companies.

Metzger and LaMotta met with plaintiff's representatives in October of 1985 and proposed a joint venture between Chipwich and plaintiff, Chipwich to contribute its distribution system and expertise in marketing and plaintiff to put up $150,000 in capital and to have the exclusive right to market a new ice cream product in the New York area. The trademark and trade name for the product would be owned equally by plaintiff and Chipwich, and they would share equally royalties earned outside the New York area.

Plaintiff agreed to the proposal. Thereafter Chipwich suggested that the joint venture's new product be a bite-size chocolate-covered ice cream called "Love Bites." Metzger told plaintiff that Chipwich wished the arrangement for the joint venture to be divided into two agreements, a Concessionaire Agreement between plaintiff and Chipwich, and a Consulting Agreement between plaintiff and Lamet. Plaintiff consented and signed both agreements, although they did not document all the parties' rights and obligations in the joint venture. The Concessionaire Agreement, dated December 20, 1985, provided, among other things, that plaintiff would lease

from Chipwich 75 carts to sell Love Bites in the New York area. The Consulting Agreement, dated January 1, 1986, provided that Lamet would perform certain consulting services for plaintiff. These were the only written agreements between the parties.

As Metzger and La Motta had advised plaintiff, Chipwich was in bankruptcy, and any agreement with it required approval of the bankruptcy court. Upon execution of the two agreements plaintiff delivered to Chipwich's attorneys $75,000, half the money required to be paid under the agreements, to be held in escrow pending approval by the bankruptcy court. The court thereafter approved the Concessionaire Agreement, the $75,000 was released to Chipwich, and plaintiff paid the other half to Lamet.

With plaintiff's consent Chipwich entered into a noncancellable license agreement with Southwest Airlines Co. (Southwest), owner of the trademark "Love Bites," providing for Chipwich's exclusive use of the mark. In consideration for the license Chipwich paid Southwest $7,500 and plaintiff granted Southwest the option to purchase 25,000 shares of its common stock at $3.375 per share.

Between December 1985 and December 1986 plaintiff, in furtherance of the joint venture, devoted substantial time and spent more than $800,000 in the development, manufacture and distribution of Love Bites. However, in November 1986 Chipwich repudiated the joint venture, informing plaintiff that Chipwich alone owned the trademark and trade name Love Bites and had developed the mark and name, and that plaintiff was not a party to a joint venture with Chipwich.

Defendants induced plaintiff to enter into the joint venture and the two written agreements, and to devote time and spend money to develop and market Love Bites, by using a scheme to defraud and making numerous false representations, including the statements that Chipwich and plaintiff were joint venturers in developing and marketing Love Bites, that Love Bites would be marketed outside the New York area for the mutual benefit of Chipwich and plaintiff, and that Chipwich would make available its distribution system outside the New York area. The purpose of the false statements was to enable defendants to use plaintiff's money and facilities to develop and market the product and then to usurp sole ownership of it.

The joint venture constitutes an "enterprise," and defendants used the United States mails and telephones in interstate commerce for the purpose of executing the scheme to defraud.

The complaint asserts that defendants violated 18 U.S.C. § 1962(a) and (c) by engaging in a scheme of fraud and false representation involving several acts indictable under 18 U.S.C. § 1341 (prohibiting mail fraud) and § 1343 (prohibiting wire fraud).

## THE RICO PROVISIONS RELIED UPON

The two sections of RICO on which plaintiff bases its claim require it to show that defendants engaged in "a pattern of racketeering activity." So far as pertinent section 1962(a) provides, in substance, that it is unlawful for "any person" who has received any income derived "from a pattern of racketeering activity" to "use or invest" any part of such income "in acquisition of any interest in, or the establishment or operation of, any enterprise" engaged in interstate commerce. Section 1962(c), in substance, makes it unlawful for any person "associated" with any such enterprise "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

Section 1961(1) defines "racketeering activity" as a variety of acts made criminal under federal and state law, including acts indictable under the wire and mail fraud provisions. Under 18 U.S.C. § 1961(5) a " 'pattern of racketeering activity' requires at least two acts of racketeering activity."

Section 1964(c) permits a person "injured in his business or property by reason of a violation of section 1962" to sue in a feder-

al court and recover treble damages and a reasonable attorney's fee.

## LEGISLATIVE HISTORY OF RICO

A brief review of the avowed Congressional objectives of the RICO legislation will put this court's holding in context.

The legislative history of RICO has been described in scholarly and perceptive articles, Lynch, *RICO: The Crime of Being a Criminal,* 87 Colum.L.Rev., 661, 920 (1987), and *A Reply to Michael Goldsmith,* 88 Colum.L.Rev., 802 (1988) (hereafter collectively Lynch), and does not require extensive rehearsal here. It is enough to note that the legislation was conceived by its sponsors as a response to the "infiltration" by "organized crime" of legitimate "enterprises." For example, the Senate Committee Report proposing the legislation recites: "It has as its purpose the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce. It seeks to achieve this objective by the fashioning of new criminal and civil remedies and investigative procedures." S.Rep. No. 617, 91st Cong., 1st Sess. 76 (1969).

To accomplish this purpose section 1962 of the statute established four new crimes. Section 1962(a), referred to above, prohibits any person from investing income obtained from a pattern of racketeering activity or through collection of an unlawful debt to acquire an interest in "any enterprise" engaged in interstate commerce. Section 1962(b) makes it unlawful for any person to acquire or maintain any interest in such an enterprise through such a pattern or collection of unlawful debt. Section 1962(c), also referred to above, prohibits any person associated with such an enterprise from conducting its affairs through such a pattern or collection of unlawful debt. Section 1962(d) proscribes a conspiracy to violate the other three subsections.

The legislation thus dealt with the acquisition of an interest in a business by the use of tainted monies stemming from racketeering or by the use of other racketeering acts and with the operation of the business, however obtained, through racketeering acts. Moreover, to meet the perceived threat of infiltration the statute provided in section 1963 for 20 year jail terms, heavy fines, and, perhaps most importantly, criminal forfeiture of any interest acquired or maintained in the "enterprise."

In addition, the Senate Report proposed section 1964, describing it as bringing to "bear on the infiltration of organized crime into legitimate business or other organizations the full panoply of civil remedies" to accomplish the "reform of corrupted organizations." *Id.* at 81, 160. Sections 1964(a) and (b) permit the Attorney General to seek orders to prevent violations of section 1962, including orders of divestment of any interest in an enterprise or of dissolution or reorganization of it and prohibitions against engaging in the same type of endeavor.

The House thereafter adopted what became the section under which the present action is brought, section 1964(c), described above, permitting persons injured in business or property by a violation of section 1962 to sue and recover treble damages and attorney's fees. The sponsor of the House bill described the treble damage provision as "another example of the antitrust remedy being adapted for use against organized criminality," 116 Cong.Rec. 35295 (1970), and the Senate sponsor of the legislation endorsed the provision as "a major new tool in extirpating the baneful influence of organized crime in our economic life." *Id.* at 25190.

## INTERPRETATION OF RICO

Although the sponsors of RICO articulated the limited objective of removing the influence of organized crime from legitimate organizations, they used broad statutory language clearly susceptible of expansive construction to embrace much more. Like latter day Pygmalions they created a statutory Galatea that assumed a life of her own. Driven by fundamental constitutional and definitional difficulties Congress adopted words that justify, if they do not invite, judicial interpretations extending the reach of the statute. Lynch, 87 Colum.L. Rev., at 685.

For example, in identifying those to whom criminal sanctions are to be applied, RICO does not describe them as members or associates of "organized crime," even generally as an association of persons in the "business" or "profession" of crime. Instead, the law provides a functional definition. A "person" who acts like those engaged in organized crime, that is, a person who commits crimes characteristic of organized crime, is to be dealt with in the same way as members or associates of organized crime, provided that the crimes committed are part of "a pattern of racketeering acts." Congress apparently contemplated that from that "pattern" one could conclude that the wrongdoer has criminal propensities sufficiently similar to those in the organized business of crime to justify the imposition of new and greatly increased penalties including forfeiture.

The characteristic of "organized crime" that the sponsors of RICO believed warranted special treatment was "continuing" criminality. The typical organized crime group had a formal hierarchical structure, and each branch of it employed "enforcers" to commit acts of violence and "corruptors" to establish relations with public officials and other influential persons, all in order "to guarantee its continuing existence." S.Rep. No. 617, 91st Cong., 1st Sess. 41 (1969).

It appears, therefore, that whatever else may be said of the inclusive wording of RICO, the requirement that the racketeering acts constitute a "pattern" had the purpose of requiring a continuity of criminal behavior at least somewhat comparable to the persistency of the professional criminal conduct of organized crime. While, as noted, section 1961(5) recites that " 'pattern of racketeering activity' requires at least two acts of racketeering activity," it does not define a pattern as consisting of two such acts. The Supreme Court emphasized this in a now notorious footnote in *Sedima, S.P.R.L. v. Imrex, Co., Inc.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14 (1985), explaining: "The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a 'pattern.' The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern."

The Senate Report is explicit. "The concept of 'pattern' is essential to the operation of the statute. One isolated 'racketeering activity' was thought insufficient to trigger the remedies provided under the proposed chapter, largely because the net would be too large and the remedies disproportionate to the gravity of the offense. The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' *and the threat of continuing activity* to be effective. It is this factor of continuity plus relationship which combines to produce a pattern." S.Rep. No. 617, 91st Cong., 1st. Sess. 158 (1969) (emphasis supplied).

Thus what Congress believed justified the imposition of the severe RICO remedies was that the wrongdoer both committed "more than one" racketeering act "and" gave evidence of a "threat" of "continuing" criminal activity. The mere commission of two racketeering acts would not be enough. If the person was not so far dedicated to crime as to pose such a threat, the RICO remedies would be "disproportionate to the gravity of the offense."

Informed by the foregoing legislative history this court concludes that the present complaint has not made out a RICO claim. At best the complaint asserts a successful and completed scheme by defendants to defraud plaintiff of its funds and to keep the profits of the venture for themselves. There are allegations of numerous racketeering acts but no statement from which a "threat" of "continuing" crime can be inferred. Indeed, the complaint states that the defendants achieved their fraudulent objective of extracting funds from plaintiff within the three months from October 1985 to December 1985. There is no allegation that this fraud was the precursor to other and repeated crimes.

This court deems its holding consistent with the results in all of the Second Circuit cases decided since the Supreme Court's *Sedima* opinion. The decision in *United States v. Ianniello*, 808 F.2d 184 (2d Cir. 1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 3229, 97 L.Ed.2d 736 (1987), seems reconcilable with *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46 (2d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), and *Beauford v. Helmsley*, 843 F.2d 103 (2d Cir.1988), *reh'g en banc granted*, No. 87–7216 (with *United States v. Indelicato*, No. 87–1085) (argued June 13, 1988), and the intervening Second Circuit cases cited in *Beauford*.

In *Ianniello* the members of the enterprise constituted persons dedicated to the continuing criminal end of skimming the profits from bars and restaurants and avoiding taxes. It was the very purpose of those persons to commit repeated crimes without any end in sight. Their association in the enterprise therefore revealed that they posed a threat of "continuing" activity. The nature of the enterprise was significant not merely because it was ongoing. Most legitimate enterprises are ongoing. The nature of the enterprise was important in considering whether the proof showed a "pattern" because each person who became a member showed by joining that his objective was the repeated commission of crime.

This court does not consider the result in *Ianniello* to require a holding that two racketeering acts alone are sufficient to show a "pattern." They may or they may not, depending on the other evidence in the case putting them in context. Under the language of RICO an individual person, even though unconnected with any organization, may engage in a pattern of racketeering activity, provided the proof shows that he was so given over to crime as to justify a conclusion that he will continue to commit specified crimes. Membership in an "enterprise" may supply facts significant in coming to that conclusion, but it is not a prerequisite. If the nature of the enterprise is considered significant in determining that a member of it poses a threat of continuous crime, the enterprise itself must have an objective of continuing crime.

The contrast between *Ianniello* and *Beauford*, *Beck* and like cases is plain. The persons alleged to have violated RICO in *Beck* and *Beauford* were hardly people dedicated to a life of crime, although they may have committed acts of fraud. The "enterprise" in those cases could not fairly be characterized as an organization with the objective, or even the propensity, to commit continuing crime, and thus mere membership in it did not supply evidence of such a predilection by the members.

## CONCLUSION

Because the allegations do not state facts showing that defendants engaged in a "pattern of racketeering activity" within the meaning of RICO, the court dismisses the complaint without passing on defendants' other contentions.

So ordered.