Joseph A. RIS, Chapter 11 Trustee, Estate of Penvest, Inc., Plaintiff,

v.

Forest K. BEDELL, et al., Defendants.

No. 87 Civ. 4146 (LLS).

United States District Court, S.D. New York.

Oct. 13, 1988.

Ellen G. Zindler, O'Dwyer & Bernstein, New York City (Brian O'Dwyer, of counsel), for plaintiff.

Richard W. Levitt, New York City, for defendant Howard Finger.

Weil, Gotshal & Manges, New York City (Philip Byler, of counsel), for defendants Edward Ross, Alvin Finkle and Finkle & Ross.

Seymour N. Harris, Mineola, N.Y., for defendant Stanley Smith.

Pelletreau & Pelletreau, Patchogue, N.Y. (Bruce T. Wallace, of counsel), for defendants George McBride, Union Sav. Bank of Long Island.

Benjamin H. Segal, New York City, for defendant Samuel Cooper.

Goodkind, Wechsler, Labaton & Rudoff, New York City (Mariam Silber, of counsel), for defendants Michael Beckman, Bell, Kalnick, Beckman, Klee & Green.

## OPINION and ORDER

STANTON, District Judge.

Ten of the defendants[1] in this action under RICO, the Racketeer Influenced and Corrupt Organizations Act, Pub.L. No. 91–452, tit. IX, 84 Stat. 941 (codified as amended at 18 U.S.C. §§ 1961–1968) (1982 & Supp. IV 1986), move to dismiss the complaint as to them, asserting that it fails to plead sufficient continuity in the RICO enterprise and the required elements of certain predicate acts.

Penvest, Inc. ("Penvest") provided investing services for pension plans which

---

1. The ten defendants are Samuel Cooper, Howard Finger, Edward Ross, Alvin Finkle, Finkle & Ross, Michael Beckman, Beckman's law firm, George McBride, Union Savings Bank, and Stanley Smith. Smith's motion, unopposed, is granted.

deposited their funds with Penvest. By late 1983, however, Penvest had filed under Chapter 11 of the Bankruptcy Code. Plaintiff, Penvest's Chapter 11 trustee, sues fifty-seven defendants under RICO claiming predicate act violations of mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, theft from an employee benefit plan, 18 U.S.C. § 664, and receiving money with the intent to influence an employee pension benefit plan, 18 U.S.C. § 1954. (Plaintiff also alleges state law claims.) It is the pleading of those predicate act violations which defendants contest.

### Discussion

Section 1964(c) allows for civil enforcement of RICO's provisions:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in an appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

To plead a violation of § 1962(c)[2], a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (footnote omitted). "Racketeering activity" is the commission of specific predicate acts for which a defendant could be convicted, *id.* at 488, and a "pattern of racketeering activity" requires at least two such acts, 18 U.S.C. § 1961(5). Any predicate act violation which requires an allegation of fraudulent conduct must meet Fed.R.Civ.P. 9(b)'s particularity requirement. A RICO "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Since

*Sedima,* this circuit has emphasized its requirement of "continuity plus relationship" with respect to the RICO enterprise, defining it as a "group associated 'for a common purpose of engaging in a course of conduct' [which] 'is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" *United States v. Ianniello,* 808 F.2d 184 (2d Cir. 1986) (quoting *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981), *cert. denied,* — U.S. —, 107 S.Ct. 3229, 97 L.Ed.2d 736 (1987). In *Albany Insurance Co. v. Esses,* 831 F.2d 41, 44 (2d Cir.1987), the court affirmed the dismissal of a RICO complaint because "[w]ith its 'straightforward and short-lived goal,' the enterprise alleged by Albany is not sufficiently 'continuing' to constitute a RICO 'enterprise.'" Allegations of "three fraudulent representations in pursuit of a single short-lived goal" did not "establish the existence of an enterprise whose illicit activities or unlawful goals are continuing ones" in *Creative Bath Products, Inc. v. Connecticut General Life Insurance Co.,* 837 F.2d 561, 564 (2d Cir.1988). Most recently, the Second Circuit summarized its RICO jurisprudence in *Beauford v. Helmsley,* 843 F.2d 103, 110 (2d Cir.1988), *petition for rehearing en banc granted:*

> Essentially, then, the court has come some distance from *Ianniello.* Although, except for *Albany* we speak of 'enterprise' rather than 'pattern,' we nonetheless require continuity in any event, and find insufficient evidence of continuity in a single criminal episode regardless of how many fraudulent acts it entails. In other words, a single criminal episode or scheme does not charge a claim under RICO because it lacks sufficient continuity to constitute an enterprise, even if its fraudulent acts constitute a pattern. . . .

**2.** Although the complaint, amended complaint, and amplifications do not specify under which sub-section of section 1962 plaintiff sues, defendants correctly conclude that only sub-section 1962(c) could conceivably cover the allegations.

1962(c) provides:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

We must decide whether a discrete, even if widespread, and a continuing even if finite, scheme is sufficient to permit a plaintiff to take advantage of RICO. We hold that it is not.

To demonstrate the application of these principles requires a consideration of the separate schemes alleged in the complaint.

I. Alvin Finkle, Edward Ross, and the Finkle & Ross accounting partnership: The "Money In—Money Out" Scheme

In paragraphs 12 through 16, plaintiff alleges what he refers to as Scheme Two— the "Money In—Money Out Scheme." Taking as true the allegations in the amended complaint,[3] Ross and Finkle allegedly "directed investments of employee pension funds to Penvest" and later received money back from Penvest "for their personal benefit and gain, in violation of the law." (Amended Complaint, ¶ 12) Ross, a certified public accountant and member of the partnership Finkle & Ross, allegedly directed Life Skills Schools Employees Pension Trust[4] to deposit over $300,000 with Penvest. Ross then received $40,000 from Penvest in July 1981.

In addition, Ross and his partner Finkle arranged for Penvest to loan Landmark Mews Associates (of which they were offi-cers) over $400,000 through May 1982 "for their personal benefit and gain." (*Id.,* ¶ 13g) They also arranged for Penvest to make loans to two of their clients: Prime Veal Farms Inc. Employee Pension Trust, "knowing that the trustees of these funds would receive personal loans in return," and Token Pharmacy, "knowing that Token Pharmacy was not in a financial position to be able to repay the loan." (Amplification ¶ 7, 14b) And, because of repeated requests by Ross, Penvest made a secured $220,000 loan to Jesse Hyman. (*Id.,* ¶ 6)

Plaintiff alleges that these loans "were made by Penvest with intent to influence, and were received by Landmark because of and with the intent to be influenced in, their decisions and actions concerning the investment decisions of the trustees of pension fund clients of Finkle & Ross." (Amended Complaint, ¶ 10) Further, Finkle and Ross's execution of promissory notes and guarantees in connection with the loans was "because of and with intent to be influenced in their pension decisions and actions concerning the funds for which they were agents." (*Id.,* ¶ 11)

Plaintiff alleges that by their conduct these defendants violated 18 U.S.C. § 1954[5] and the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343[6].

---

**3.** Plaintiff commenced this suit on June 12, 1987 and filed an amended complaint as a matter of right on July 9, 1987. At a pretrial conference held on November 20, 1987 it was established that instead of certain defendants moving for more formal statements or to dismiss, plaintiff would provide statements to such defendants with the same force as if pleading those assertions.

Hence, this statement of facts is based upon both the amended complaint and the various "Amplification of Allegations" filed by plaintiff in February 1988. However, where an amplification describes an act or statement with no relevance to a claim asserted in the amended complaint it is not included in this discussion.

**4.** The Amplification with respect to Finkle and Ross refers to this as the Lowell School, Inc. Employees Pension Trust.

**5.** Section 1954, Offer, acceptance, or solicitation to influence operations of employee benefit plan, provides:

[A]n administrator, officer, trustee, custodian, counsel, agent, or employee of any em-ployee welfare benefit plan or employee pension benefit plan ... [who] receives or agrees to receive or solicits any fee, kickback, commission, gift, loan, money, or thing of value because of or with intent to be influenced with respect to, any of his actions, decisions, or other duties relating to any question or matter concerning such plan or any person who directly or indirectly gives or offers, or promises to give or offer, any fee, kickback, commission, gift, loan, money, or thing of value prohibited by this section, shall be fined not more than $10,000 or imprisoned not more than three years, or both ...

As used in this section, the term (a) "any employee welfare benefit plan" or "employee pension benefit plan" means any [plan] ... subject to any provision of title I of the Employee Retirement Income Security Act of 1974 ["ERISA"]....

**6.** Section 1341 provides:

Whoever, having devised or intending to devise, any scheme or artifice to defraud ... places in any post office or authorized depository for mail matter, any matter or thing

**A.** 18 U.S.C. § 1954, Receiving money with intent to influence an employee pension benefit plan.

■ "To establish a violation of § 1954, the government must prove that the defendant served in one of the positions specified in the first part of the statute, and that he solicited or received certain benefits with intent to be influenced in his dealings with the employee benefit plan." *United States v. Palmeri*, 630 F.2d 192, 198–99 n. 3 (3d Cir.1980), *cert. denied*, 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981).

Section 1954 "includes within the regulated class all persons who exercise control, direct or indirect, authorized or unauthorized, over the fund." *Id.* at 199. Those who have "no formal relationship with the plans but exercised sufficient influence over them," *id.* at 200, come under section 1954's prohibitions.

As broad as this definition may be, however, plaintiff has simply alleged that Ross and Finkle arranged loans to two clients (Prime Veal Farms and Token Pharmacy), one friend (Hyman), an organization with a plan not subject to ERISA of which they were principals (Landmark Mews), and an organization with a plan subject to ERISA of which Ross was an agent (Life Skills Schools). Except for Life Skills Schools, these allegations alone do not make either an "administrator, officer, trustee, custodian, counsel, agent, or employee of," or one who exercised significant influence over, a plan subject to ERISA. Assuming that Ross's position as an agent brings him within section 1954's ambit, the complaint does not specify in what way he was influenced in his investment decisions of Life Skills Schools. Plaintiff's assertions to the contrary, these allegations do not meet Fed.R.Civ.P. 8(e)'s liberal requirement of "simple, concise, and direct" pleadings.

Accordingly, the portions of those counts against Ross, Finkle, and Finkle & Ross alleging these violations are dismissed.[7]

**B.** Mail and Wire Fraud, 18 U.S.C. §§ 1341, 1343

■ To plead the predicate offenses of mail and wire fraud, plaintiff must allege: (1) " 'a scheme to defraud, and (2) the use of the mails or interstate wires in furtherance of the fraudulent scheme.' A scheme to defraud is a plan whose object is 'to deprive one of property through fraudulent or deceptive means, such as material misrepresentations [or] concealment.' " *In Re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. 493, 512 (S.D.N.Y.1987) (quoting *Tryco Trucking Co. v. Belk Stores Services*, 634 F.Supp. 1327, 1333 (W.D.N.C.1986)).

Under Fed.R.Civ.P. 9(b), which requires that "the circumstances constituting fraud or mistake shall be stated with particularity," a plaintiff must specify the time, place, speaker, and content of the alleged misrepresentation. *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir.1986).

Further, plaintiff must allege that the fraud was intentional:

In general, the mail and wire fraud statutes require, *inter alia*, a showing of intentional fraud. Although ... intent ... may be averred generally, plaintiffs must nonetheless provide some factual basis for conclusory allegations of intent. These factual allegations must give rise to a 'strong inference' that the defendants possessed the requisite fraudulent intent.

A common method for establishing a strong inference of scienter is to allege facts showing a motive for committing fraud and a clear opportunity for doing so. Where motive is not apparent, it is

---

whatever to be sent or delivered by the Postal Service, ... or knowingly causes to be delivered by mail according to the directions thereon ... any such matter or thing, shall be [guilty of mail fraud].
Section 1343 provides:
Whoever, having devised or intending to devise any scheme or artifice to defraud ... transmits or causes to be transmitted by

means of wire, radio, or television communication, in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be [guilty of wire fraud].

**7.** The conclusion of this Opinion and Order lists, by number, which Counts are dismissed with respect to all defendants.

still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of circumstantial allegations must be correspondingly greater.

*Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 49-50 (2d Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 698, 98 L.Ed.2d 650, *reh'g denied,* —— U.S. ——, 108 S.Ct. 1588, 99 L.Ed.2d 903 (1988) (citations omitted); *see also, Furman v. Cirrito*, 828 F.2d 898, 900 (2d Cir.1987) ("we look with a jaundiced eye upon allegations of fraud based upon information and belief").

Plaintiff contends that "paragraphs 1–6, 12–35, 57–59, 106–112, 131–135 and 166–170 of the Amended Complaint and paragraph 13 of the Amplification of Allegations ... gave defendants adequate and full notice of the charges asserted against them." (Memorandum of Law in Opposition to Motion to Dismiss by Defendants Edward Ross, Alvin Finkle, and Finkle & Ross, p. 7)

Of the 51 paragraphs cited by plaintiff, just seven refer to use of the mails or wires by these defendants. Moreover, none of the seven mentions the time, speaker, or nature of the communication. For example, paragraph 109 states:

> Upon information and belief, for the purpose of executing and attempting to execute the aforesaid scheme to defraud and/or embezzle funds from Penvest, each of the defendants listed in paragraph 108 above, on two or more occasions, did knowingly cause letters or other mailable items to be sent and delivered by means of the United States Mail, and received letters and other mailable items through the United States Mail, all prohibited by 19 [sic] U.S.C. Section 1341.

Paragraph 13 of the Amplification refers to "attached letters and other mailable items." Of the eight letters annexed to the amplification, none are from Finkle and only one is from Ross. Some of the other letters were sent to Ross or Finkle, but their receipt of such letters does not violate the mail and wire fraud statutes.

Because plaintiff has failed to (1) specify the time, content, or nature of the misrepresentations of any use of the wires, and (2) specify more than one letter sent by defendants Ross and Finkle, or the nature of the misrepresentation of that letter, paragraphs 109 and 110 of Count 3, paragraphs 132 and 133 of Count 8, and paragraph 167 and 168 of Count 14 with respect to defendants Ross, Finkle and Finkle & Ross are dismissed.

## II. Samuel Cooper, Finkle & Ross, and Howard Finger—the "Resource Capital" Scheme

Plaintiff alleges that Forest Bedell (one of Penvest's principals) "involved Penvest directly in a loanshark scheme operated by Mel Cooper and Jesse Hyman." (Amended Complaint, ¶ 17) At Bedell's direction, Penvest allegedly loaned "over $2 million to Cooper and Hyman individually and to entities controlled by them, which in turn engaged in extortionate credit transactions with these funds. Penvest received no adequate security or repayment" on the loans. (*Id.*)

Two separate transactions constitute this scheme.

### A. Samuel Cooper and Finkle & Ross

Penvest advanced over $1,300,000 to the "Cooper–Hyman Group," which consisted of Jesse Hyman, Mel Cooper, and his father, Samuel Cooper ("Cooper"). Part of this sum ($400,000) was used in April 1982 by Jesse Hyman to purchase one-half of the Cooper–Hyman Group entities from Cooper, leaving Mel Cooper and Jesse Hyman as shareholders. According to the Amplification, Cooper entered into escrow agreements with Penvest, accepted Penvest checks, left them to appear unpaid, and received alternate payments in the amount of $400,000.[8]

The collateral for these loans was the assignment of interests in various equipment leases held by Cooper–Hyman Group

---

**8.** In April 1985 Jesse Hyman and Mel Cooper were convicted of criminal RICO violations, 84 Cr. 579 (LBS), and each received 30-year sentences for "engaging in extortionate credit transactions through Resource, Etna Leasing and Cooper Funding." (Amended Complaint, ¶ 27)

entities, and personal guarantees of Hyman and Mel Cooper. Plaintiff alleges that Finkle & Ross provided Penvest with a financial compilation valuing the collateral at $2,029,049, but that Finkle and Ross, as well as Cooper, should have known that the value was "substantially less than $1 million." (Amended Complaint ¶ 24) Further, Ross allegedly knew that the loan was made in reliance on the financial compilation and his statements.

Plaintiff alleges that Finkle, Ross, and Finkle & Ross thereby violated the mail and wire fraud statutes, and that they and Cooper aided and abetted violations of 18 U.S.C. § 664.[9]

### 1. Mail and Wire Fraud

Plaintiff's claim under this scheme with respect to Finkle, Ross, and Finkle & Ross fails for the same reasons discussed under the "Money In—Money Out" scheme. Indeed, plaintiff apparently relies on the same letters annexed to his amplification as support for these claims.

Accordingly, the portions of those Counts which allege Ross, Finkle, and Finkle & Ross violated these statutes by their conduct in this scheme are dismissed.

### 2. 18 U.S.C. § 664, Theft or Embezzlement from employee benefit plan.

■ It is "a federal crime to embezzle, steal, or willfully and unlawfully convert or abstract assets of any employee welfare or pension benefit plan." *United States v. Andreen*, 628 F.2d 1236, 1240 (9th Cir. 1980).

> The essence of the crime is theft and in the context of union funds or pension plans the offense includes a taking or appropriation that is unauthorized, if accomplished with specific criminal intent.... The act to be criminal must be willful, which means an act done with a

fraudulent intent or a bad purpose or an evil motive.

*Id.* at 1241. (footnote omitted) Further, embezzlement "encompasses the fraudulent appropriation of the property of another by one in lawful possession thereof. The concept of unlawful conversion encompasses the use of property, placed in one's custody for a limited purpose, in an unauthorized manner or to an unauthorized extent." *Id.* (citations omitted)

Finkle and Ross persuasively argue that the compilation, based solely on information given to them by the company, was not a representation, and even if their compilation overstated the value of certain Cooper–Hyman Group collateral, such an act does not violate section 664. At most, they contend, they have breached their fiduciary duty to the Cooper–Hyman Group.

An accountant's compilation of asset values can not be said to amount to conversion, theft or embezzlement. Accordingly, the portions of those counts which allege that these defendants violated 18 U.S.C. § 664 are dismissed.

■ Cooper correctly contends that even if he did aid and abet a violation of this statute, at most his only goal was to sell his interest in the Cooper–Hyman Group to Hyman. His argument that such a "straightforward and short-lived goal," *Albany Insurance Co. v. Esses*, 831 F.2d at 44, does not meet the Second Circuit's "continuity plus relationship" requirement of a RICO enterprise requires dismissal of the complaint's allegations against him.

Accordingly, those counts which refer to Samuel Cooper are dismissed.

### B. Howard Finger [10]

■ In February 1983 Wings of Wooster Street, Ltd., a new business of which Fin-

---

9. Section 664, Theft or embezzlement from employee benefit plan, provides:

> Any person who embezzles, steals, or unlawfully and wilfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected

therewith, shall be fined not more than $10,000, or imprisoned not more than five years, or both....

Like 18 U.S.C. § 1954, section 664 requires that the plan be subject to any provision of title I of ERISA.

10. Allegations contained in the "Friendly Loans" scheme against Howard Finger are incorporated here. Under the "Resource Capital" scheme, the

ger was a partner, was suffering from its loan shark obligations to Jesse Hyman and Mel Cooper. Hyman helped Finger obtain money from Penvest. In exchange, Finger arranged for a boxer he managed to place $100,000 of his pension funds with Penvest; this sum eventually grew to $302,000. According to plaintiff, Penvest "made the pretense of obtaining personal guarantees for the purported 'loans' [but] it was understood that this money was not going to be repaid." Wings of Wooster Street, Ltd. eventually filed a bankruptcy petition under chapter 11, § 301 of the Bankruptcy Code in May 1983, never having made any payments to Penvest. Similarly, Finger and his partners defaulted on their personal guarantees to Penvest.

Plaintiff alleges that by his conduct Finger violated the mail and wire fraud statutes, and aided and abetted the Cooper–Hyman Group in violation of 18 U.S.C. § 664.

■ As for the mail and wire fraud allegations, plaintiff does not identify what, if any, motive Finger had for defrauding Penvest. Plaintiff's after-the-fact, unsupported assertion that "it was understood that this money was not going to be repaid" does not amount to a strong circumstantial allegation of fraudulent intent. As for the allegation that Finger stole or embezzled from an employee benefit plan, Finger convincingly argues that an undersecured loan does not amount to conversion. Plaintiff does not allege, and the facts do not support an inference, that the loan was unauthorized.

■ Finger also argues that since his alleged participation in the "Friendly Loans" and "Resource Capital" schemes amounted to obtaining a single line of credit on behalf of Wings of Wooster Street, Ltd. from Penvest, plaintiff has not alleged the requisite continuity with respect to his participation in the RICO enterprise.

Like Cooper, Finger at most pursued only a "straightforward and short-lived goal" which does not subject him to liability under RICO. Accordingly, the complaint's allegations against Finger are dismissed.

### III. Michael Beckman and the Bell, Kalnick law firm—the "ProArts" Scheme

The gravamen of this scheme is that defendants "induced Penvest to convert its debt to a valueless equity position" in ProArts.

During 1982 and 1983, Penvest loaned over $600,000 to ProArts, a debtor-in-possession under Chapter 11. (Amplification, ¶ 11) These loans were secured by accounts receivable and inventory of ProArts, but because they "were without any priority or security under the U.S. Bankruptcy Code, [it was] highly speculative and wholly improper for funds such as those held by Penvest." (Amended Complaint, ¶ 41) Following Penvest's loans, Bedell became a vice president of ProArts and received $25,000 annual salary. His sons also received positions with ProArts.

In early 1983 Michael Beckman became a director of ProArts, and his firm, Bell, Kalnick, Beckman, Klee & Green ("Bell, Kalnick"), served as counsel to ProArts. (Id., ¶ 45) ProArts' Plan of Reorganization, confirmed on July 26, 1983, "required the ProArts' debt to Penvest to be converted to non-voting preferred stock in Pro–Arts and required Penvest to continue to advance funds to Pro–Arts ... Penvest was also to receive common stock." Beckman, however, received 10% of the 37% of ProArts stock allocated to Penvest "in his personal name with no consideration being given therefor." (Id., ¶ 47) Apparently because Beckman attended meetings and was "involved in the transmission of" proposals to Pro–Arts' bankruptcy counsel (Amplification, ¶ 9), plaintiff alleges that Beckman "was instrumental in arranging this transaction to his personal gain and the detriment of Penvest."

Further, plaintiff states that Beckman knew that Bedell and another officer sought to buy ProArts' real estate in Medi-

---

amended complaint only alleges that loans made to Wings of Wooster Street, Ltd. were inadequately secured. The allegations set forth here appear in the affidavit of Ellen Zindler (sworn to Oct. 20, 1987), plaintiff's attorney.

na, Ohio to lease back to ProArts for their own benefit, although this was "in direct conflict with their responsibilities as officers of the corporations involved, and was a breach of Forest Bedell's fiduciary duty to the depositors in Penvest ..." (Amended Complaint, ¶ 53), and yet "assisted in the transfer of funds from Penvest, Inc. to ProArts, Inc. with the knowledge that such investments involved self-dealing on behalf of Bedell and were wholly improper investments for pension funds of the type held by Penvest." (*Id.*, ¶ 54)

By their actions, plaintiff contends that defendants aided and abetted Bedell and others in violating 18 U.S.C. § 664, and the mail and wire fraud statutes.

### A. 18 U.S.C. § 664

■ Defendants argue that plaintiff has "merely alleged that a prior debt which existed before these defendant attorneys ever became involved with Pro–Arts, Inc. was simply converted from a debt position to an equity position by a reorganization of stock." (Beckman Memorandum, p. 7) Such a stock reorganization, they contend, does not amount to the illicit activities proscribed by section 664.

As with the others, plaintiff attempts to characterize as illegal conduct which is not. Accordingly, the portions of those Counts alleging Beckman and Bell, Kalnick violated 18 U.S.C. § 664 are dismissed.

### B. Mail and Wire Fraud

■ Plaintiff alleges that Beckman and Bell, Kalnick violated the mail and wire fraud statutes in two transactions associated with ProArts: Bedell's sale and lease back arrangement with ProArts and Penvest's change from a debt to an equity position in ProArts. Defendants contend that these charges, based only on information and belief, must be dismissed because plaintiff fails to specify the nature of the alleged scheme and the content of the misrepresentations, or the requisite intent to defraud. They argue that the "mere attempt to raise funds by selling assets and leasing them back in order to keep a bankrupt company afloat" (Memorandum of

Law in Support of Motion to Dismiss by Defendants Bell, Kalnick, Beckman, Klee & Green and Michael Beckman, p. 10) ("Beckman Memorandum") does not evidence intent to defraud. Defendants also assert (*id.*, p. 7–8):

> It is clear that Penvest, Inc. invested in a bankrupt corporation, and then upon realizing its investment was shaky, sought to secure its position by turning it from a debtor to an equity holder of the corporation and agreed to fund it more money to keep the business afloat.

Plaintiff may point to a possible opportunity of defendants, as ProArts' counsel, to defraud Penvest but the complaint lacks any facts from which one could infer any motive for so doing. Beckman also owned ProArts' stock. Therefore, the most likely inference, absent any substantiated allegation by plaintiff to the contrary, is that he would have no motive to assist any acts designed to decrease the value of ProArts' assets.

Accordingly, the portions of those Counts which allege violations of 18 U.S.C. §§ 1341, 1343 against Beckman and Bell, Kalnick are dismissed.

### IV. Alvin Finkle and Edward Ross—the "North Carolina Property" Scheme

Between 1981 and 1983, Penvest loaned $145,000 to Garden Associates, a limited partnership formed by Bedell, and $660,000 to Mid–County Investments, Inc. ("Mid–County"), the controlling interest of which was owned by Penvest, Garden Associates and/or Bedell. (Amended Complaint ¶ 64) In exchange, Penvest received in April 1982 a deed of trust to the North Carolina property owned by Mid–County. (*Id.*, ¶ 65)

Plaintiff alleges that in late 1981 Finkle and Ross "loaned money to Garden Associates and/or Mid–County, which loans were repaid with the funds of Penvest, approximately one month thereafter together with interest totaling 20% of the principal said loans." (*Id.*, ¶ 62, 66)

By virtue of their conduct, Finkle and Ross violated the mail and wire fraud statutes and, by "ma[king] a considerable prof-

it in Penvest's transactions with Mid–County and Garden Associates," violated 18 U.S.C. § 664. (*Id.*, ¶ 69, 163)

## A. Mail and Wire Fraud

As already discussed under two other schemes, plaintiff has not met the requirements for a properly pleaded claim against these defendants under the mail and wire fraud statutes.

## B. 18 U.S.C. § 664

■ Even if Finkle and Ross received 20% interest on a loan repaid by Penvest, they contend that such activity does not amount to conversion. Plaintiff does not assert that the loan was not a valid obligation, and a higher-than-average interest payment on a valid loan does not fall within the conduct proscribed by section 664.

Accordingly, the portions of those Counts against defendants Finkle, Ross, and Finkle & Ross which concern their involvement in this scheme are dismissed.

## V. George McBride and the Union Savings Bank—the "Union Savings Bank" Scheme

■ Penvest maintained an account at Union Savings Bank ("Union") in Patchogue, New York from mid–1981 until May 1982. Union had a policy which required two authorized signatures on any requests for withdrawal. However, one of Union's officers, defendant George McBride, permitted withdrawals of over $800,000 to be made from Penvest's account on the basis of telephone requests or just one signature.

Plaintiff alleges that these defendants used the mail and wires to carry out this fraud.

Nowhere, however, is it alleged that either had a motive for or reaped any benefit from this departure from Union's two signatures policy. Nor is it explained how requiring less than two signatures on a withdrawal slip worked a fraud upon Penvest and its investors. Further, even if defendants somehow violated these stat-

utes, their actions were not of the continuing nature RICO requires.

Accordingly, Count 18 is dismissed.

### Pendent Jurisdiction

■ Plaintiff's remaining claims with respect to these defendants are based on state law. When "federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed. 2d 218 (1966). There is ample precedent in this circuit's RICO cases for dismissing pendent state law claims. *See, e.g., Albany*, 831 F.2d at 45.

Accordingly, the portions of Count 19 against the movant-defendants and the portion of Count 21 against Finkle, Ross, and Finkle & Ross are dismissed.

### Leave to Replead

■ Fed.R.Civ.P. Rule 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires." "However, the district court may deny leave to replead if the proposed amendments would be futile." *Albany Insurance Co.*, 831 F.2d at 45 (denying leave to replead because proposed "allegations would do nothing to establish the 'continuity plus' that *Ianniello* requires to establish a 'pattern.'") (citation omitted). In *Beauford*, 843 F.2d at 110, the court found that since the "additional acts alleged in the proposed second amended complaint do not take away from the discrete, finite nature of the scheme alleged," leave to replead was properly denied.

Here plaintiff's allegations, even if properly pleaded, would amount to "short-lived" goals not meeting the "continuity" requirement of a RICO enterprise. Further, the allegations against these defendants do not demonstrate a sufficient "relationship" among them. Plaintiff's allegations of the RICO enterprise are contained in one paragraph:

> At all time relevant herein, Penvest was an enterprise affecting interstate commerce within the meaning of 18 U.S.C. sections 1961(4) and 1962.

(Complaint, ¶ 5) Plaintiff's conclusory assertion that defendants operated Penvest "by and through a pattern of fraudulent and illegal activities resulting in the loss of $5,000,000", *id.* ¶ 1, hardly defines a "common purpose" of the enterprise or explains how defendants interacted to achieve their common purpose. Plaintiff has not even alleged that defendants knew each other, let alone that they were associated as a group or had a common purpose with respect to Penvest. Indeed, as the description of each scheme shows, each defendant had a very different purpose in his dealings with Penvest.

Accordingly, because plaintiff has failed to allege properly a RICO enterprise, all portions of the counts against these defendants are dismissed. Plaintiff amended the complaint once, as of right, and had a second opportunity to replead the allegations against these defendants. In light of these attempts, and the futility of any further ones, leave to replead is denied.

### Rule 11 Sanctions

■ Defendants McBride and Union also move for sanctions pursuant to Fed.R. Civ.P. 11.

Finding that "[t]here is no basis for requiring plaintiffs to have anticipated the direction that this Court's post-*Sedima* decisions would take" and approving the district court's determination that plaintiffs had not asserted their claims in bad faith, the Second Circuit denied defendants' application for sanctions pursuant to Fed.R. Civ.P. 11 in *Creative Bath Products*, 837 F.2d at 564.

Plaintiff also filed this suit at a time when this circuit's RICO jurisprudence was uncertain. Despite the passage of time until plaintiff's filing of the amplifications in February 1988, that uncertainty continues (i.e., the pending *en banc* decision in the *Beauford* case). In light of the still-coalescing RICO case law, and an absence of apparent bad faith on plaintiff's part, the motion for sanctions is denied.

### Conclusion

Defendants' motions to dismiss are granted. Counts 1, 2, 3, 5, 6, 8, 10, 11, 12, 13, 14, 18, 19, and 21 against the defendants named in footnote one are dismissed.

Defendants' McBride and Union Savings Bank application for Rule 11 sanctions is denied.

As there is no just reason for delay, the clerk shall enter judgment pursuant to Fed. R.Civ.P. 54(b) dismissing the complaint, amended complaint, and respective Amplifications of Allegations with respect to the defendants named in footnote one of this opinion.