**BANCO LATINO INTERNATIONAL,**
Plaintiff,

v.

Gustavo A. **GOMEZ LOPEZ,**
et al., Defendant.

No. 95–1300–CIV.

United States District Court,
S.D. Florida.

April 20, 2000.

Jonathan Goodman, Akerman, Senterfitt & Eidson, Miami, FL, Richard Hinds, Evan Fultz, Jay Livingstone, Cleary, Gottlieb, et al., Washington, DC, for Plaintiff.

Luis Delgado, Homer, Bonner & Delgado, Miami, FL, for Defendant Gomez-Lopez, Brian Kief Key Biscayne, FL, for Defendant Pulgar, George Combaluzier, West Miami, FL, for Defendant Flachi and Gilly.

### ORDER & OPINION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

HIGHSMITH, District Judge.

THIS CAUSE is before the Court upon the separate motions for summary judgment filed by Defendants Gustavo A. Gomez Lopez, Maria Teresa Pulgar, Folco Falchi Tiberi, and Pedro Gilly and Plaintiff's omnibus response to those motions.[1] For the reasons set forth below, the motions for summary judgment are granted.

## I. BACKGROUND

"This action results from the collapse of the Venezuelan banking industry and the decision by Venezuelan banking authorities to intervene and assume control over Banco Latino, S.A.C.A. ([hereinafter] 'BLCA'), the country's second largest banking insti-

---

1. Defendant Eloy Montenegro Salom also filed a motion for summary judgment. In response to Montenegro's summary judgment motion, Plaintiff voluntarily withdrew its claims against Montenegro. On March 27, 2000, the Court entered an order dismissing the claims against Montenegro.

tution." *Banco Latino v. Gomez Lopez,* 17 F.Supp.2d 1327, 1329 (S.D.Fla.1998). These events had far reaching international consequences, including criminal prosecutions and civil suits in Venezuela and the filing of Chapter 11 bankruptcy by Plaintiff Banco Latino International (hereinafter "BLI"). Through this action, BLI seeks to impose liability upon some of its former directors, officers, and advisors for a series of financial transactions involving BLI, BLCA, Banco Latino, N.V. (hereinafter "BLNV"), and a number of third-party, "pass through" institutions, which allegedly led to BLI's failure.[2]

### A. The Players

### 1. The Banks

The transactions that gave rise to this action comprised a concerted effort by three closely related financial institutions to maintain the appearance that all three institutions were financially healthy. Eventually, their efforts failed and the institutions all collapsed. The three institutions are:

### BLCA

BLCA was founded in 1950, and grew to become the second largest bank in Venezuela. At some point in the late 1980's, BLCA began to incur serious liquidity problems. In order to alleviate these difficulties, BLCA orchestrated transactions with its various subsidiaries, including BLI, which temporarily transferred cash from the subsidiaries to BLCA. By 1994, BLCA's liquidity problems had not improved, and it could no longer mask its financial situation through transactions amongst it and its subsidiaries. That year, the Venezuelan government intervened and placed BLCA in receivership. The Venezuelan government, through its equivalent of the Federal Deposit Insurance Corporation, provided public funds to satisfy many of BLCA's obligations. Nonetheless, "BLCA's collapse triggered a 'run' on BLI by depositors," which BLI was unable to meet and resulted in BLI's subsequent bankruptcy. *Banco Latino v. Gomez Lopez,* 17 F.Supp.2d at 1330–31.

### BLNV

BLNV was what is commonly referred to as an off-shore bank. It was established in 1978 under the laws of the Netherlands Antilles, and its offices were located in Curacao. Through a group of other off-shore companies, control of BLNV was vested in Latimer Inversiones, which also owned nearly twenty percent of BLCA. When BLCA collapsed in 1994 and was taken over by the Venezuelan government, BLNV also fell into receivership.

### BLI

BLI was a financial institution located in Miami, Florida and organized under the laws of the United States. BLI was an Edge Act bank, i.e., it was established under the Edge Act, 12 U.S.C. § 611 et seq. *See generally Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.,* 576 F.Supp. 107, 161 n. 78 (D.Del. 1983) (detailing the history of the Edge Act), *aff'd,* 740 F.2d 956 (3rd Cir.1984) (table). "Such banks deal almost exclusively in international business. They may engage in domestic transactions only to the extent that such transactions are incidental to their international business." *Donahue v. Far Eastern Air Transport*

---

**2.** This action was originally brought by five Plaintiffs, including BLCA, against "a diverse group of persons and entities." *Banco Latino v. Gomez Lopez,* 17 F.Supp.2d at 1330 n. 2. On June 20, 1998, Judge Wilkie D. Ferguson, Jr., to whom this case was originally assigned, entered an order dismissing the claims of all of the Plaintiffs except BLI for forum non conveniens. *See id.* at 1333. Following the dismissal of the majority of the claims, BLI— the only remaining Plaintiff—filed an amended complaint against: (1) Gustavo A Gomez Lopez; (2) Maria Teresa Pulgar; (3) Folco Flachi Tiberi; (4) Eloy Montenegro Salom; (5) Giacomo Leon; (6) Pedro Gilly; (7) Claudia Cordero Febres de Gomez; and (8)Antonio Ugueto Truijillo. Those Defendants were all former officers and directors of the related institutions involved in the transactions that allegedly led to BLI's failure.

*Corp.*, 652 F.2d 1032, 1035 n. 3 (D.C.Cir. 1981) (citing 12 U.S.C. § 616). The Edge Act was originally enacted in 1919 to facilitate the international activities of American banks. *See Rose Hall, Ltd.*, 576 F.Supp. at 161 n. 78; *see also* 12 U.S.C. § 611a ("it is the purpose of [the Edge Act] to provide for the establishment of international banking and financial corporations operating under Federal supervision with powers sufficiently broad to enable them to compete effectively with similar foreign-owned institutions"). Its provisions are now utilized by domestic and foreign institutions alike, to create what amount to "holding compan[ies] for entities engaging in international and foreign banking." *Rose Hall, Ltd.*, 576 F.Supp. at 161. The financial stability of an Edge Act bank, which is regulated by the Federal Reserve, provides an obvious advantage in the volatile field of international finance. Thus, although BLI was located in Miami, its business was conducted primarily beyond the borders of the United States.

As explained above, Edge Act banks are often subsidiaries of large international financial institutions. BLI, which opened in 1983, was owned entirely by two foreign banks. BLCA owned 76.3% of BLI, and the remaining 23.7% of BLI was owned by BLNV, which was also closely connected to BLCA. In January of 1994, BLI filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of Florida, following the collapse of its parent company BLCA.

### 2. The Individuals [3]

The Defendants that have now moved for summary judgment all participated in the management of BLI preceding its failure. According to BLI, these Defendants were responsible for the transactions that resulted in BLI's failure and bankruptcy. The Defendants that have moved for sum-

mary judgment and their relevant positions are:

### Gustavo A. Gomez Lopez

Gomez Lopez was the president of BLCA from September 23, 1992 to December 21, 1993. From September 12, 1993 to December 21, 1993, he was also the chairman of the board of directors of BLI.[4]

### Maria Teresa Pulgar

Pulgar was on BLCA's board of directors from March 23, 1988 until March 19, 1991. From March 13, 1993 to January 19, 1994, she was on BLI's board of directors. She also served as BLCA's executive vice president during the time that the transactions giving rise to this action took place.

### Folco Falchi Tiberi

Falchi was a member of BLNV's board of directors and its president from March 15, 1991 until January 19, 1994. He was also an advisor to BLI's board of directors.

### Pedro Gilly

Gilly was on BLCA's board of directors from March 23, 1988 until January 14, 1994. From July 22, 1991 until January 19, 1992 he was a member of BLI's board of directors. Additionally, Gilly was on BLNV's board of directors from January 31, 1992 to January 19, 1994.

### B. The Scheme

As indicated above, the impetus for this action is a series of transactions that were devised to conceal the financial condition of BLCA. The parties have dubbed these transactions "triangular transactions," and the Court will also employ this terminology. The goal of the triangular transactions was to conceal transfers of cash from BLI to BLCA and BLNV. Prior to undertaking the triangular transactions, BLI

---

3. The following descriptions of Defendants' positions with BLI, BLCA, and BLNV are taken from BLI's amended complaint.

4. Gomez Lopez may also have served as BLNV's chairman of the board of directors from March 1993 to December 21, 1993.

had transferred large sums of cash directly to BLCA and BLNV through transactions known as "placements." "A placement, in international banking vernacular, is a transaction in which a bank places its excess liquidity in another bank at a stated interest rate with a designated maturity date.... The placement appears to be a close relative of the time deposit." *In re Banco Latino Int'l,* 176 B.R. 278, 280 n. 1 (Bankr.S.D.Fla.1994). A 1987 audit of BLI by the Federal Reserve Bank of Atlanta revealed that BLI's placements with BLNV and BLCA had resulted in the significant undercapitalization of BLI and had overexposed BLI to "countries classified for transfer risk." June 27, 1988 Mem. of Understanding between the Federal Reserve Bank of Atlanta and BLI, at 1 (submitted as tab fifteen of BLI's exhibits accompanying its omnibus response to the motions for summary judgment). After the 1987 audit, BLI entered into a memorandum of understanding with the Federal Reserve Bank of Atlanta, through which BLI agreed to reduce substantially its placements with BLCA and BLNV and to reduce its exposure Venezuela. *See id.* at 1–2.

Following the 1987 audit and the subsequent memorandum of understanding, BLI, BLCA, and BLNV developed the triangular transaction scheme to conceal from federal regulators further placements by BLI, which would violate the memorandum of understanding. At its core, a triangular transaction is a straw transaction. Rather than making placements directly with BLCA or BLNV, BLI made placements with various third-party international banks, who then made corresponding placements with BLNV. BLNV would then either retain the placement or disperse the funds to BLCA. To ensure that the corresponding placement was made with BLNV, BLI would agree not to demand repayment of its placement from the third-party bank until BLNV had repaid the placement it was to receive from the third-party bank. In effect, BLI continued to make placements with BLNV but simply routed them through institutions unaffiliated with BLI, BLCA, or BLNV. The triangular transactions took place until the failures of BLI, BLCA, and BLNV in January of 1994.

## II. UNDISPUTED FACTS

BLI was an Edge Act bank subject to regulation by the Federal Reserve. BLI was owned entirely by BLCA and BLNV, with BLCA owning 76.3% of BLI and BLNV owning 23.7%. Between 1988 and 1994, Defendants Gustavo A. Gomez Lopez, Maria Teresa Pulgar, Folco Falchi Tiberi, and Pedro Gilly (hereinafter collectively "Defendants") served as directors, officers, and/or advisors of BLI, BLCA, and BLNV. During that time period, BLI made large placements of cash with various third-party international banks. In conjunction with many of these placements, corresponding placements were made by the third-party banks with BLNV, in what are referred to as triangular transactions. BLNV, in turn, dispersed some of the placements made with it to BLCA. BLI was paid approximately the prevailing interest rate for all of the placements it made with third-party banks, and, in some instances, received an additional fee from BLNV, when the corresponding placement was made by the third-party bank (i.e., the triangular transaction was completed). BLI has now recouped the principal of all of its placements made with third-party banks, with the exception of a $3,000,000.00 placement made with Amazonas International Bank and a $1,700,000.00 placement made with Araven Financial Limited. Reimbursement for the placement made with Amazonas International Bank was, however, settled for $2,300,000.00 in an adversary proceeding instituted in BLI's Chapter 11 proceedings. The $1,700,000.00 placement made with Araven Financial Limited has never been satisfied, although it had a maturity date of January 14, 1994. BLCA's 1994 failure caused a run on deposits made with BLI.

## III. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to assess the evidence to determine whether there is an actual need for a trial. *Mulhall v. Advance Security, Inc.,* 19 F.3d 586, 590 (11th Cir.1994); *see also* Fed.R.Civ.P. 56(e) advisory committee's notes (stating that "[t]he very mission of the summary judgment procedure is to pierce the pleadings and assess the proof in order to see whether there is a genuine need for a trial"). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact." Fed.R.Civ.P. 56(c). If no material issue of fact exists, summary judgment avoids the needless delay and expense of a trial. *See* 6 James Wm. Moore et al., Moore's Federal Practice § 56.04(1) (2d ed.1996).

What the material facts are in a particular case is determined by the substantive law to be applied in the case. *Mulhall,* 19 F.3d at 590. "Material facts are those that might affect the outcome of the suit under the governing law." *Id.* Thus, the mere existence of a factual dispute will not preclude summary judgment. To avoid summary judgment, the factual question must be one that could determine the case.

The party moving for summary judgment is charged with the initial burden of demonstrating the absence of any question of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has made such a showing, the party opposing summary judgment is afforded an opportunity to refute that showing. *Id.* at 324, 106 S.Ct. 2548. Rule 56 states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e). Thus, the party opposing summary judgment cannot create a question of fact by simply denying the sworn evidence supporting the moving party's motion.

## IV. DISCUSSION

The gravamen of BLI's complaint is that Defendants defrauded BLI by devising the triangular transaction scheme to benefit BLI's parent corporations—BLCA and BLNV. Through its amended complaint, BLI asserts claims for: (1) violation of the federal civil RICO statute, 18 U.S.C. § 1964; (2) conspiracy to violate the federal civil RICO statute; (3) fraud; (4) breach of the fiduciary duty of care; (5) breach of the fiduciary duty of loyalty; (6) common law civil conspiracy; and (7) constructive fraud.[5] As explained below, all of these claims fail because BLI is unable to demonstrate that it was in anyway defrauded or betrayed by Defendants. Rather, the evidence establishes that BLI, BLCA, and BLNV engaged in the triangular transactions together, in an effort to avoid scrutiny by federal regulators.

### A. BLI's Civil RICO Claims

BLI's primary causes of action are its civil RICO (Racketeer Influenced and Corrupt Organizations) claims. The federal RICO laws were, of course, originally enacted to combat organized crime. Today, however, they are more often employed as a tool in complex commercial litigation than as weapon to fight crime. *See generally Bill Buck Chevrolet, Inc. v. GTE Florida, Inc.,* 54 F.Supp.2d 1127, 1130 (M.D.Fla.1999) (discussing the history and development of RICO). In order to avail itself of RICO's civil remedy, though, a party must still establish that it was victimized by a criminal enterprise. *See* 18

---

**5.** BLI's amended complaint also asserts a claim for constructive trust; however, BLI has abandoned that claim. *See* Joint Pretrial Stipulation at 2 n. 1.

U.S.C. § 1964(c); *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 481, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) ("The Racketeer Influenced and Corrupt Organizations Act (RICO) ... provides a private civil action to recover treble damages for injury 'by reason of a violation of' its substantive provisions.").

The Eleventh Circuit has explained that there are "three essential elements" to a civil RICO claim: "(1) a violation of section 1962; (2) injury to business or property; and (3) that the violation caused the injury." *Avirgan v. Hull,* 932 F.2d 1572, 1577 (11th Cir.1991) (citing *O'Malley v. O'Neill,* 887 F.2d 1557, 1561 (11th Cir.1989)). In this case, BLI has alleged that Defendants' actions in connection with the triangular transactions violated § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "A violation of § 1962(c), the section on which [BLI] relies, requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering." *Sedima, S.P.R.L.,* 473 U.S. at 496, 105 S.Ct. 3275 (footnote omitted); *see also Yellow Bus Lines v. Local Union 639,* 913 F.2d 948, 950 (D.C.Cir.1990) (en banc).

### BLI's RICO Claims Fail Because it Was not the Victim of a Pattern of Racketeering

Assuming, as BLI maintains, that Defendants were intricately involved in the execution of the triangular transactions, there is no evidence to support that the transactions constituted an actionable pattern of racketeering. "A 'pattern of racketeering activity' is defined in § 1961(5) to require commission of at least two crimes listed in § 1961(1), including [bank fraud (18 U.S.C. § 1344,)][6] mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343)." *Beck v. Manufacturers Hanover Trust, Co.,* 645 F.Supp. 675, 679 (S.D.N.Y.), *amended by,* 650 F.Supp. 48 (S.D.N.Y.1986), *aff'd,* 820 F.2d 46 (2nd Cir. 1987). BLI argues that the triangular transactions constituted bank, mail, and/or wire fraud in violation of the United States Criminal Code, and that they therefore formed a pattern of racketeering in violation of § 1962(c). An essential element of the crimes of bank, mail, and wire fraud is the intent to defraud a targeted victim. *See* 18 U.S.C. § 1341 (requiring intent to defraud); 18 U.S.C. § 1343 (same); 18 U.S.C. § 1344 (same). In civil RICO actions, alleging underlying crimes of fraud, if the putative predicate acts lack offense specific sceinter, courts have consistently barred the claims by finding that: (1) the claimant lacks standing to maintain a civil RICO claim; (2) there is no actionable pattern of racketeering, due to the lack of convergence of the perpetrator's intent to defraud and the injury incurred by the claimant; or (3) the injury incurred by the claimant was not proximately caused by the underlying fraud. *See generally Lifschultz Fast Freight v. Consolidated Freightways,* 805 F.Supp. 1277, 1290–94 (D.S.C.1992) (granting summary judgment on civil RICO claims after discussing lack of proximate cause and convergence), *aff'd,* 998 F.2d 1009 (4th Cir.1993) (table). Regardless of the particular judicial nomenclature employed, the reasoning and the result remain the same; i.e., RICO's civil remedy was not intended to create a new means of recovery in garden variety commercial disputes and commercial litigators cannot transform every commercial dispute into a civil RICO action, in which treble damages are available, by contorting the facts of the dispute to resemble vaguely a criminal undertaking. *See gen-*

---

6. As originally enacted, § 1961(1) did not included bank fraud as a so called predicate act for purposes of establishing a pattern of racketeering. In 1989, § 1961(1) was amended to include financial institution fraud (i.e., bank fraud) in violation of 18 U.S.C. § 1344 as a predicate act.

*erally Ris v. Bedell,* 699 F.Supp. 429, 438 (S.D.N.Y.1988) (observing that the plaintiff had "attempt[ed] to characterize as illegal conduct which [was] not" in order to bring claims under RICO's civil remedy provision).

█ In the present case, there is no evidence that the triangular transactions were made with the requisite intent to defraud BLI. Rather, the evidence is that BLI was to be paid the prevailing rate of interest for the placements it made with the third-party banks, that in some instances BLI was also paid an additional fee by BLNV when BLNV received its corresponding placement, and that the principal was expected to be repaid by the receiving banks. It is quite evident that the triangular transaction scheme was devised by the principals of BLI, BLCA, and BLNV to deceive federal regulators, by creating the appearance that BLI was not overexposing itself to BLNV and BLCA. The intent to deceive federal regulators does not, however, equate to the mens rea to defraud BLI. *See United States v. Gafyczk,* 847 F.2d 685, 689 (11th Cir.1988) ("behavior reflecting an intent to deceive does not in itself satisfy the legal requirements for proving an intent to defraud"); *see also Reynolds v. East Dyer Development Co.,* 882 F.2d 1249, 1252 (7th Cir. 1989) ("Not all conduct that strikes a court as sharp dealing or unethical conduct is a 'scheme or artifice to defraud,' [constituting a predicate act of mail, wire, or bank fraud for RICO purposes]."); *Morda v. Klein,* 865 F.2d 782, 785 (6th Cir.1989) ("breach of a fiduciary duty alone, without the 'something more' of fraudulent intent, cannot constitute mail fraud"). In short, BLI was a willing participant in the triangular transaction scheme, not a victim of

it. *See generally Pelletier v. Zweifel,* 921 F.2d 1465, 1506–10 (11th Cir.1991) (discussing the failings of a civil RICO claim where the Plaintiff was not victimized by the fraudulent scheme but entered it "with his eyes wide open").

█ Under § 1964(c), in order for losses suffered by BLI to be actionable as bank, mail, or wire fraud, the triangular transaction scheme must have been undertaken with the intent to deprive BLI "of something by trick, deceit, chicane or overreaching." *McNally v. United States,* 483 U.S. 350, 358, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (internal quotation omitted); *see also United States v. Lew,* 875 F.2d 219, 221–22 (9th Cir.1989). In a civil RICO case, "when the alleged predicate act is [bank,] mail or wire fraud, *the plaintiff must have been a target of the scheme to defraud* and must have relied to his detriment on misrepresentations made in furtherance of that scheme."[7] *Pelletier,* 921 F.2d at 1499–1500 (citing *O'Malley v. O'Neill,* 887 F.2d 1557, 1563 & n. 9 (11th Cir.1989)) (emphasis supplied); *see also McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,* 904 F.2d 786, 791 (1st Cir. 1990) ("the scheme must be intended to *deceive* another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct"); *Lew,* 875 F.2d at 221 ("the intent must be to obtain money or property from the one who is deceived"). Where, as in the instant case, the only party possibly defrauded by a scheme is the federal government, private litigants, who may have been harmed by the scheme, simply cannot bring a civil RICO action.[8] *See O'Malley v. O'Neill,* 887 F.2d at 1563; *see generally Tsipouras v. W & M Properties, Inc.,* 9 F.Supp.2d 365, 367 (S.D.N.Y.1998) ("it is

---

7. The position adopted by the Eleventh Circuit that the claimant must have been the target of the scheme to defraud is not universally accepted by the federal circuit courts of appeal. *See O'Malley v. O'Neill,* 887 F.2d at 1563 (noting the existence of contrary authority).

8. As discussed above, the judicial bar to these types of civil RICO claims may be articulated in various terms. The Eleventh Circuit has construed the bar both as (1) a proximate cause issue, *see Pelletier,* 921 F.2d at 1510, and (2) a standing issue. *See O'Malley v. O'Neill,* 887 F.2d at 1563.

firmly established that an employee who is not the target of defendants' alleged racketeering activity lacks standing to bring a civil RICO claim against his former employer"). Thus, the fact that BLI may have suffered collateral injury, as a result of the triangular transactions, is not sufficient to establish the requisite specific intent to defraud BLI and cannot serve as the basis for BLI's civil RICO claims. Defendants' motions for summary judgement are therefore granted with respect to BLI's civil RICO claims (counts I and II of BLI's amended complaint).

## B. BLI's State Law Claims

In addition to its civil RICO's claims, BLI has asserted five separate state law claims against Defendants. Three of BLI's state law claims arise out of the obligations imposed upon Defendants by their positions with BLI. Those claims, which will be addressed together below, are for: (1) breach of the fiduciary duty of care; (2) breach of the fiduciary duty of loyalty; and (3) constructive fraud.[9] Plaintiffs remaining state law claims for (1) fraud and (2) civil conspiracy will then be addressed together.

### 1. The Breach of Duty Claims

Through both statute and case law, Florida has developed rather strict standards for imposing personal liability upon corporate officers and directors for actions taken in their official capacities. *See* Fla. Stat. § 607.0831 (establishing standard for director liability); *In re Southeast Banking Corp.*, 827 F.Supp. 742, 747–48, 754–55 (S.D.Fla.1993) (discussing the case law developing Florida's standard for imposing officer and director liability and the business judgment rule affirmative defense), *rev'd on other grounds,* 69 F.3d 1539 (11th Cir.1995). Relying upon a facet of this body of law, Defendants challenge BLI's ability to impose liability based upon the manner in which they exercised their duties as officers and directors.[10] Specifically, Defendants assert that any actions that could be construed as breaching their fiduciary duties are imputed to BLI and therefore cannot, under Florida law, serve as a basis for liability.

■ "Generally, courts impute a bank officer or director's knowledge to the bank unless the officer or director acts with an interest adverse to the bank." *Federal Deposit Insurance Corp. v. Ernst & Young,* 967 F.2d 166, 170 (5th Cir.1992). The imputation doctrine is rooted in the general principal that a corporation acts only through its agents. *See Tew v. Chase Manhattan Bank, N.A.,* 728 F.Supp. 1551, 1559 (S.D.Fla.), *amended by,* 741 F.Supp. 220 (S.D.Fla.1990). In Florida's leading case on the imputation doctrine, *Seidman & Seidman v. Gee,* 625 So.2d 1 (Fla.App. 1992),[11] the court reviewed the case law from various jurisdictions and then adopted a broad variation of the rule that imputes the actions of officers and directors to a corporation. *See id.* at 2–3.

---

9. Florida law recognizes an equitable cause of action for constructive fraud when a fiduciary or confidential relationship has been abused. *See First Union Nat'l Bank of Florida v. Whitener,* 715 So.2d 979, 982 (Fla.App.1998), *review denied,* 727 So.2d 915 (Fla.1999). In cases alleging corporate malfeasances, this cause of action is often asserted in conjunction with the more familiar claims for breach of the fiduciary duty of care and breach of the fiduciary duty of loyalty. *See, e.g., Halkey–Roberts Corp. v. Mackal,* 641 So.2d 445 (Fla. App.1994).

10. Defendant Falchi asserts that he cannot be held liable for breaching a duty of loyalty or care to BLI, because he was not an officer or director of BLI but only an advisor to the board of directors. BLI has not contested this assertion in its omnibus response; therefore, to the extent that the breach of duty claims are asserted against Defendant Falchi, summary judgment is, alternatively, granted on the basis that he had no fiduciary relationship to BLI.

11. Although the *Gee* decision is not a decision of Florida's highest court (i.e., the Supreme Court of Florida), the Eleventh Circuit has recognized it as establishing the law of Florida to be applied by federal courts sitting in diversity cases. *See Beck v. Deloitte & Touche,* 144 F.3d 732, 736 (11th Cir.1998).

Under the rule announced in *Gee,* actions taken by an officer or director in his official capacity are imputed to the corporation and constitute an absolute defense to subsequent lawsuits by the corporation, unless the corporation derived absolutely no benefit from those actions (i.e., the actions benefitted only the officer or director's pecuniary interests).[12] *See id.* at 3; *see also Beck v. Deloitte & Touche,* 144 F.3d at 736.

In *Gee,* the court differentiated between actions by directors or officers that "loot" the corporation and those that are not primarily aimed at defrauding the corporation but instead turn the corporation into "an 'engine of theft' against outsiders." 625 So.2d at 3. In the seminal case on the imputation doctrine, Judge Posner described this distinction:

> Fraud on behalf of a corporation is not the same thing as fraud against it. Fraud against the corporation usually hurts just the corporation; the stockholders are the principal if not the only victims; their equities vis-a-vis a careless or reckless auditor are therefore strong. But the stockholders of a corporation whose officers commit fraud for the benefit of the corporation are beneficiaries of the fraud. [Although they may] not [be] net beneficiaries, after the fraud is unmasked . . . .

*Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449, 456 (7th Cir.1982). Under Florida law, when an officer or director's actions were not undertaken to loot or defraud his corporation and the corporation derived some benefit from them, the actions are imputed to the corporation, even if they ultimately resulted in the failure of the corporation. *See Gee,* 625 So.2d at 3.

■ It is uncontested that BLI received the prevailing rate of interest for the triangular transactions and that, in some instances, BLI received an additional fee from BLNV attributable to the triangular transactions. As discussed above, the deception or fraud motivating the triangular transaction scheme was not targeted at BLI but at federal regulators. BLI, as well as its parent companies BLCA and BLNV, temporarily benefitted from the triangular transaction scheme. Thus, Defendants' knowledge of the triangular transactions and their actions in executing the triangular transactions are imputed to BLI. Defendants' motions for summary judgment are therefore granted with respect to BLI's breach of duty claims (counts IV, V, and VII of BLI's amended complaint).

### 2. Fraud and Civil Conspiracy [13]

■ BLI's final two claims are for fraud and civil conspiracy. As with BLI's civil RICO claims, these claims are fatally flawed because of the absence of the specific intent to defraud BLI. Under Florida law, the causes of action of fraud and civil conspiracy both require sceinter. *See Parker v. State of Fla. Bd. of Regents,* 724 So.2d 163, 169 (Fla.App.1998) ("bad faith must be deemed to be a necessary element of any action for fraud"); *Peoples Nat'l Bank v. First Union Nat'l Bank,* 667

---

**12.** In *Welt v. Sirmans,* 3 F.Supp.2d 1396 (S.D.Fla.1997), Judge Lenore C. Nesbitt recognized a limited exception to Florida's imputation rule. Judge Nesbitt ruled that the imputation rule did not apply in a case brought to vindicate the rights of a defunct corporation by a bankruptcy trustee, for the benefit of the defunct corporation's creditors. *See id.* at 1402–03. The distinguishing factors, in Judge Nesbitt's opinion, were that in that case (1) the deterrence objective supporting a broad imputation rule, which was relied upon by the *Gee* court, was not implicated because the corporation was not the real party in interest and (2) it would not have been equitable to impose the rule against creditors whose interests were harmed by the fraud and who had no opportunity to uncover the fraud. *See id.* The exception, however, is not implicated in this case as this action was not instituted by BLI's chapter 11 trustee.

**13.** These claims are addressed separately from the imputation doctrine, because acts constituting fraud or civil conspiracy by Defendants against BLI, if established, would be considered ultra vires and would therefore not be imputed to BLI.

So.2d 876, 879 (Fla.App.1996) ("The essential elements of [civil conspiracy] are a malicious motive and coercion through numbers or economic influence.") (quoting *Churruca v. Miami Jai Alai, Inc.*, 353 So.2d 547, 550 (Fla.1977)). Because the triangular transactions were not intended to defraud BLI, they cannot support BLI's claims for fraud and civil conspiracy. Accordingly, Defendants' motions for summary judgment are granted with respect to BLI's claims of fraud and civil conspiracy (counts III and VI of BLI's amended complaint).

## V. CONCLUSION

This litigation has dragged on for five years and cost the litigants millions of dollars in attorneys' fees. Along the way, the majority of parties have been dismissed from the case or settled. At this juncture, BLI is left asserting, in a blanket fashion, an array of vague fraud based claims against a hodgepodge of its former officers, directors, and advisors. As explained above, none of these claims can withstand scrutiny. Hence, the summary judgment motions of Defendants Gustavo A. Gomez Lopez, Maria Teresa Pulgar, Folco Falchi Tiberi, and Pedro Gilly are GRANTED. Although Defendants Giacomo Leon and Claudia Cordero Febres de Gomez have not moved for summary judgment, the claims against them are identical, both legally and factually, to the claims discussed above.[14] Accordingly, summary judgment is also GRANTED in favor of Defendants Giacomo Leon and Claudia Cordero Febres de Gomez.

14. Defendant Leon Giacomo, who resides in Israel, has appeared in this action pro se but did not file a motion for summary judgment. In an order dated July 6, 1999, the Court allowed service of process to be effected upon Defendant Claudia Cordero Febres de Gomez by publication; however, she has never made an appearance in this action.